[No. B156445. Second Dist., Div. Eight. Mar. 14, 2003.]

In re JOSHUA S. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND
FAMILY SERVICES, Plaintiff and Respondent, v.
PENNY S., Defendant;
JOSHUA S. et al., Appellants.

## COUNSEL

Merrill Lee Toole, under appointment by the Court of Appeal, for Appellants.

Lloyd W. Pellman, County Counsel, and Stephanie Jo Farrell, Deputy County Counsel, for Plaintiff and Respondent.

## OPINION

**RUBIN, J.**—Appellants Joshua S. and Alexander C. (the children),[1] appeal from the January 7, 2002, order terminating the juvenile court's jurisdiction over them more than 12 months after their indigent maternal grandmother, with whom they lived on a Canadian Indian reservation in the province of Saskatchewan, was appointed their legal guardian. They contend the juvenile court: (1) abused its discretion in terminating jurisdiction without evidence the children's essential needs could be met without financial assistance from California; and (2) erred in not determining the issue of funding to maintain the children's placement before terminating jurisdiction. After review, we reverse the order terminating jurisdiction and remand for further proceedings consistent with the views expressed herein.

---

[1]Although appellant's opening brief refers to "Appellant Joshua S.," this appears to be a clerical error, inasmuch as the notice of appeal identifies both Joshua and Alexander as appellants.

### FACTUAL AND PROCEDURAL BACKGROUND

Joshua S. was born in July 1996 with a positive toxicology for barbiturates. He was taken into custody by the Los Angeles County Department of Children and Family Services (the department) the following day. On October 17, he was adjudicated a person described by Welfare and Institutions Code section 300, subdivision (b).[2] Joshua's brother, Alexander, was born in July 1997, was detained by the department on July 30, and on October 29 was adjudicated a person described by section 300, subdivisions (b), (c) and (j).

The children's mother was a member of the Ahtahkakoop Reserve in Saskatchewan, Canada. The maternal grandmother lived at the Sandy Bank Indian Reserve located there. On July 29, 1996, the juvenile court ordered the department to evaluate whether the maternal grandmother's home was suitable for placement of Joshua there.[3]

On August 21, 1997, the juvenile court ordered Alexander transferred to Canada at the expense of Los Angeles County and released into the custody of the maternal grandmother, but stayed the order 30 days pending completion of a home study of the maternal grandmother. On September 18, 1997, a clinical social worker from the Saskatchewan social services department (Canadian social worker) advised the California social worker (California social worker)[4] that the maternal grandmother wanted the children and the "reserve community" supported their return, but "inconclusive discussions occurred with [the reserve community] regarding the issue of financial responsibility for the children." On October 1, the Canadian social worker advised that the reserve community simply did not have the financial resources to care for the children and the maternal grandmother had concluded that she could not care for them because of her age, Alexander's youth and Joshua's special needs.[5] The Canadian social worker informed the California social worker on October 10, that the maternal grandmother had changed her mind and would continue with the home study. According to the home study done by the Canadian social services department, the maternal grandmother and her common law husband lived on the reserve, had a combined annual income of about $20,000, and would require financial assistance to care for the children. The Canadian social services department approved the maternal grandmother's home. At a hearing on October 29, the

---

[2] All further statutory sections are to the Welfare and Institutions Code unless otherwise specified.

[3] It was determined that the paternal grandparents were not suitable caretakers.

[4] During the pendency of this case, more than one social worker handled the matter.

[5] Joshua was initially found to have mild delays in his overall development and a short attention span. His lack of language skills was "of great concern." Physical therapy was initiated but, despite some gains, was discontinued.

court ordered the children placed with the maternal grandmother. The court did not directly respond to an inquiry by the children's appointed counsel as to whether jurisdiction would be transferred to Canada, except to note Canada was requesting financing, and to state it could not order funds to go out of the United States.

The children were actually placed with maternal grandmother on December 3, 1997. That day, the maternal grandmother executed a "Placement Letter" which stated: "[The maternal grandmother] is in agreement to provide for all the minors' necessities, including medical care and educational costs, until such time that the minors have reached legal age of maturity." The children were registered with the Ahtakakoop Reserve, thereby becoming dual citizens of Canada and the United States.

By April 1998, a permanent placement plan had not been settled upon, although the department was recommending adoption. The maternal grandmother was reluctant to adopt because she did not want to take her daughter's parental rights away. According to the Ahtahkakoop Child & Family Services Agency, the reserve opposed adoption "of any of our Band Member children." The agency recommended the children remain on the reserve with the maternal grandmother in long-term foster care. According to a letter from the Canadian social worker, the reserve was unable to provide financial assistance and "if the California file is closed, we will be closing the files on the boys as well, therefore, will not have the means to provide financial assistance."

At the April 29 hearing, counsel for the children argued the tribe was financially unable to help the family and if the court terminated jurisdiction, the children would be without financial assistance. The court ordered an expert appointed to investigate whether the matter was governed by the Indian Child Welfare Act (ICWA) vis-à-vis jurisdiction and funding. The court-appointed expert subsequently reported the Canadian Indian tribe had no affiliation with any American Indian tribe, and the matter therefore did not fall under the ICWA. Based on conversations with the tribe, the expert opined the tribe would eventually take jurisdiction of the case. Finding it to be in the best interests of the children, the juvenile court ordered the expert to continue liaising with the Canadian tribe. At that hearing, it terminated family reunification services and continued the matter for a section 322.26 permanent plan hearing (section .26 hearing).

In August 1998, the California social worker assured the maternal grandmother the children would be eligible for Adoption Assistance Program (AAP) funding and Medi-Cal services until they were 18 years old. Although she remained reluctant to take parental rights away from her daughter, the maternal grandmother agreed to discuss the matter with the

tribal social services office (sometimes tribal social worker) and Canadian social worker. On October 22, the juvenile court granted the department's request to continue the section .26 hearing to January 26, 1999, to allow the California social worker to discuss kinship adoption with the maternal grandmother.

According to a report prepared for the January 26, 1999, section .26 hearing, the maternal grandmother continued to express a preference for long-term foster care to give her daughter a chance to regain custody of the children. The California social worker had meanwhile learned from the Canadian social worker and tribal social worker that the maternal grandmother would lose the financial assistance she was receiving from the Canadian department of social services if she became the children's legal guardian. The only way for the maternal grandmother to retain Canadian financial assistance and medical care for the children was to keep the children in long-term foster care. For this reason, the tribal social worker and the Canadian social worker both recommended to the maternal grandmother that she keep the children in long-term foster care. Based upon these circumstances, the department changed its permanent placement plan recommendation from adoption to long-term foster care. The juvenile court found this recommendation "absolutely not acceptable," and continued the matter to July 29, 1999.

According to a report prepared for the continued section .26 hearing, Canada had discontinued the children's medical coverage and the financial assistance the maternal grandmother was receiving from Canada would be terminated if she either adopted the children or became their legal guardian. Under legal guardianship, medical coverage and supervision by the tribal social service office would continue, but all other financial aid would have to be provided by California. Under long-term foster care, Canadian financial aid would continue, but medical coverage might be discontinued. The department represented it could continue to provide financial assistance to the children in Canada as long as the court ordered the department to do so, and the children were title IV eligible.[6]

At the July 29, 1999, section .26 hearing, county counsel represented that Canada would recognize a legal guardianship established in California.

---

[6]Title IV of the Social Security Act (42 U.S.C. § 601 et seq.) makes federal funds available to those states who submit and have approved by the federal Department of Health, Education and Welfare a plan for aid and services to needy families with children. In California, the program is implemented through article 5 of the Welfare and Institutions Code, commencing with section 11400. Pursuant to section 11401, subdivision (b)(1), the program formerly known as Aid to Families with Dependent Children-Foster Care (AFDC-FC) (now TANF) is available to children adjudicated persons described by section 300 and removed from the physical custody of his or her parents as a result of a judicial determination that continuance in the home would be contrary to the child's welfare. Such a child who is placed in the approved home of a relative is eligible for AFDC-FC payments. (§ 11401, subd. (a).) The

Without resolving the funding issues, and after ascertaining that the maternal grandmother would accept legal guardianship rather than lose the children altogether, the juvenile court continued the matter to October 22, for preparation of guardianship papers.

In a report prepared for the continued hearing, the department recommended the court appoint the maternal grandmother as the children's legal guardian without permanently terminating parental rights and without terminating the court's jurisdiction. The department explained maternal grandmother had been told: "Los Angeles County will fund the boys at the rate of $560.00 per month, as court jurisdiction will not terminate, and that Canada Department of Social Services will provide medical insurance upon receipt of legal guardianship papers from this court." At the hearing on October 22, the court appointed maternal grandmother the children's legal guardian, ordered the department to ensure she continued to receive *Youakim*[7] funding, and continued the matter to April 21, 2000, for review.

Pursuant to the court's order, the California social worker submitted a funding request to the department. Several days later, the department informed the social worker that it was against department policy to send monthly funding out of the country. On February 24, 2000, the California social worker ascertained from the department's special payments division that *Youakim* funding *could* be sent out of the country pursuant to a court order, but that the maternal grandmother was no longer eligible for those funds because, as a legal guardian, she was no longer considered a relative. On March 10, a regional supervisor confirmed the department would not pay funds out of the country. Accordingly, financial assistance from the Kinship Guardianship Assistance Payment Program (Kin-GAP),[8] which the

---

general rule that only residents of the state are eligible for public social services is inapplicable to AFDC-FC payments. (§ 11105, subd. (d).)

[7]*Miller v. Youakim* (1979) 440 U.S. 125 [99 S.Ct. 957, 59 L.Ed.2d 194] (relative care givers are entitled to the same financial aid as nonrelative care givers).

[8]Section 366.21, subdivision (j) provides: "If, at any hearing held pursuant to Section 366.26, a guardianship is established for the minor with a relative, and juvenile court dependency is subsequently dismissed, the relative shall be eligible for aid under the Kin GAP program as provided in [§ 11360, et seq.]." (See also § 366.22, subd. (c) ["If at any hearing held pursuant to Section 366.26, a legal guardianship is established for the minor with a relative, and juvenile dependency is subsequently dismissed, the relative shall be eligible for aid under the Kin-GAP program . . . ."].) " 'Kinship Guardianship Assistance Payments (Kin-GAP)' means the aid provided on behalf of children in kinship care . . . ." (§ 11362, subd. (a).) A "kinship guardian" is a relative of the child who has been appointed the child's legal guardian pursuant to section 366.26. (§ 11362, subd. (b).) A child under the age of 18 years is eligible to receive Kin-GAP aid if that child had been adjudged a dependent child pursuant to section 300, has been living with a relative for 12 months, has had a kinship guardianship with that relative established as the result of a permanent plan pursuant to

California social worker had believed would be available to the maternal grandmother, was not available after all. The regional supervisor recommended the filing of "an adverse petition to have the order removed."

In a letter dated March 14, 2000, William Wardell, legal counsel for the Ahtahkakoop First Nation Child and Family Services Agency, informed the department's regional supervisor that the maternal grandmother had not yet received the funding ordered by the juvenile court on October 22, 1999, and the financial assistance the maternal grandmother was receiving from Canada was going to cease at the end of March.

In a progress report dated March 24, the department requested the legal guardianship not be reversed so as to avoid terminating the children's medical coverage, but that the matter be continued to give the department an opportunity to further evaluate the issue. At a hearing that day, counsel for the children suggested using the availability of financial assistance as a lever to persuade the maternal grandmother to adopt the children. The court agreed to order the department supervisors who had told the California social worker that legal guardianship was the best option to assure the children of continued financial support, but who were now reneging on that promise, to appear in court. It nevertheless expressed its intention to *not* agree to long-term foster care under any circumstances. At the next hearing on April 24, counsel for the department represented that the maternal grandmother would be eligible for financial assistance if she adopted the children. In a letter to the California social worker dated December 2000, Canadian Attorney Wardell explained, although adoption was antithetical to the aboriginal tribal people's cultural belief that parents should be allowed to parent their children at any time they are able, he would discuss with the maternal grandmother and the tribal social worker how adoption could work within their culture and maintain funding for the children.

At a hearing on January 4, 2001, counsel for the children explained: although it was "against the Indian tribe's spirituality for the grandmother to

section 366.26, and has had his or her dependency dismissed after January 1, 2000, pursuant to section 366.3. (§ 11363, subd. (a)(1)-(4).) Although nothing in section 11363 makes living in the United States a condition of eligibility for Kin-GAP program aid, section 11374, subdivision (a) provides: "Each county that formally had court ordered jurisdiction under Section 300 over a child receiving benefits under the Kin-GAP program shall be responsible for paying the child's aid regardless of where the child actually resides, so long as the child resides in California." Section 11361 provides: "The Legislature finds and declares that the Kinship Guardianship Assistance Payment Program is intended to enhance family preservation and stability by recognizing that many children are in long-term, stable placements with relatives, that these placements are the permanent plan for the child, that dependencies can be dismissed pursuant to Section 366.3 with legal guardianship granted to the relative, and that there is no need for continued governmental intervention in the family life through ongoing, scheduled court and social services supervision of the placement."

do this adoption," the maternal grandmother understood that adoption was the only way she could continue to receive financial support. Counsel had assured Wardell that the department would send financial assistance outside of the United States only for adoption. Wardell requested "a final statement saying the only way [the department would] fund is through adoption," which the Canadian government could use to "come after" the United States. The juvenile court continued the matter for another 90 days with the understanding that jurisdiction would be terminated at that time.

On March 14, Wardell told the California social worker the maternal grandmother would adopt the children "as soon as all the adoption terms and funding terms were provided to [Wardell] in writing on a legal document written by an attorney of the Superior Court of California." On June 29, the maternal grandmother confirmed she was willing to adopt the children as long as Wardell approved. On July 3, Wardell told the California social worker the adoption was contingent upon Wardell seeing " 'in writing' that AAP funds would be paid to [the maternal grandmother] upon adoptive placement." The California social worker assured Wardell: "If the adoptive family moves anywhere in the world AAP follows the family." Wardell asked for a written copy of this policy, including confirmation that it applied to children who were adoptively placed in another country. Upon receipt of such written confirmation, Wardell stated, the maternal grandmother was ready to proceed with the adoption.

On April 9, the juvenile court continued the matter for another 90 days. It directed the department to tell Wardell "we do not give money to Canada. If the department believes that they can give money to Canadian children after the adoption, that's up to them. [Ninety] days from now, I will terminate parental rights, and we will enter in a plan of adoption with these children, or I will terminate jurisdiction . . . ." On July 9, the matter was continued to January 7, 2002. The court ordered the department to begin looking for an adoptive home in the United States.

In a letter dated December 10, 2001, the California social worker advised the maternal grandmother that the department would not provide any services to her or the children because they were not residents of the United States, and that the department intended to recommend that jurisdiction be terminated. Accordingly, in the report prepared for the January 7, 2002, hearing, the department stated: "[Department] policy is very clear that [the department] cannot complete an international adoption due to the fact that [the department] does not have agreements with adoption agencies in Canada to complete an Adoption home study or provide supervision. [The California social worker] researched post-adoption funding relating to this

situation, and found there will be no adoption assistance funds available unless Maternal Grandmother . . . was to relocate to the United States. Adoption Assistance Program funding is only available to families who finalize an adoption in the United States and then relocate abroad. Other than legally moving to the United States, there is no way [the department] could set up this funding source. If [the maternal grandmother] desires adopting the children she may contact Canadian Social Services to set up Court jurisdiction in Canada. [¶] Foster caretakers and legal guardians are only eligible to receive funding for children in their home if the family <u>resides</u> in the United States. This was communicated to the Maternal Grandmother at the time of the children's initial placement in 1997. At that time, the funding situation was referenced in the placement letter she signed, acknowledging her '. . . agreement to provide for all the minor's medical care and education costs until minors reach legal age.' " (Original underscoring.)

The department recommended jurisdiction be terminated, speculating that continued California court jurisdiction "may limit, rather than maximize, the options for permanent plans for the children." Other than describing the difficulty in monitoring the children's placement in Canada, the department did not explain how terminating jurisdiction would "maximize" the options for permanent placement of the children.

On January 7, 2002, the juvenile court terminated jurisdiction over the objection of the children's counsel. The children filed a timely notice of appeal.

### DISCUSSION

*The Court Abused Its Discretion in Terminating Jurisdiction*

██  The children contend the juvenile court abused its discretion by terminating jurisdiction. As we understand the children's argument, the maternal grandmother's inability to financially provide for the children constituted a foreseeable future harm to the children's welfare, which the juvenile court failed to consider in exercising its discretion to terminate jurisdiction, thus abusing that discretion. We agree.

Pursuant to section 366.26, the juvenile court has just three options at the hearing to determine a permanent placement plan, which must be applied in the following order of preference: terminate parental rights leading to adoption, guardianship, or long-term foster care. The court must choose the disposition that is best for the child. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 303 [19 Cal.Rptr.2d 544, 851 P.2d 826]; § 366.26, subd. (h) ["At all

proceedings under this section, the court . . . shall act in the best interests of the child."].) As a general rule, if the court finds the child is adoptable, it must select adoption as the permanent plan. (§ 366.26, subds. (b)(1), (c)(1).) There are exceptions to this rule. (§ 366.26, subd. (c)(1)(A)-(E).) The exception applicable here is subdivision (c)(1)(D), pursuant to which a compelling reason for not selecting adoption as the permanent placement plan is that: "The child is living with a relative or foster parent who is unable or unwilling to adopt the child because of exceptional circumstances, *that do not include an unwillingness to accept legal or financial responsibility for the child*, but who is willing and capable of providing the child with a stable and permanent environment and the removal of the child from . . . his or her relative or foster parent would be detrimental to the emotional well-being of the child. . . ." (Italics added.)[9]

Here, the juvenile court terminated reunification services on July 1, 1998, and set the matter for a section .26 hearing. At that hearing on January 26, 1999, the court rejected the department's recommendation of long-term foster care with the maternal grandmother as the permanent placement plan, observing: "These children are one and two. They reside in Canada. The department is recommending because the grandmother who has these children is insisting that she wants long term foster care. That means 17 years of hearings every six months, 17 years of funding, and she's quite clear that that's why she wants long term foster care because of the funding. Seventeen years, the State of California pays for these two children in Canada when the mother is up there also. Unacceptable."[10] At the continued section .26 hearing on July 29, the court reiterated these same objection to long-term foster care for the next 15 years with children living in Canada. On October 22, the court appointed the maternal grandmother the children's legal guardian. In so doing, it found the children adoptable, but found them to be a bonded sibling group living with a relative who was unable or unwilling to adopt. Thus, the court apparently found applicable the section 366.26, subdivision (c)(1)(D) exception to the preference for adoption.

The court's comments establish it was loath to select long-term foster care, not because it would not be in the children's best interest, but solely because it would be inconvenient to have review hearings every six months until the children reached the age of majority, and because the court believed Canada, not the County of Los Angeles, should shoulder the financial burden

---

[9]Here, there is no indication the maternal grandmother was *unwilling* to accept financial responsibility for the children. On the contrary, the evidence is undisputed that the maternal grandmother was *unable* to do so, and that the court and the department were well aware of this fact as early as the home study done before the children were placed with her.

[10]Nothing in the record supports the court's assertion that mother was living in Canada.

of caring for these children. There is no indication the court ever considered the children's best interest in the matter.

The children did not, however, appeal from the order appointing the maternal grandmother their legal guardian pursuant to section 366.26, and their time to do so has passed. Accordingly, the issue on appeal is not whether guardianship was the appropriate permanent plan, but whether the juvenile court abused its discretion in terminating its jurisdiction after the guardianship was established.

"A juvenile court has a continuing responsibility to account for the welfare of a dependent child under its jurisdiction, wherever placed, unless and until a permanent and stable home is established." (*In re Rosalinda C.* (1993) 16 Cal.App.4th 273, 279 [20 Cal.Rptr.2d 58].)[11] Where legal guardianship is chosen pursuant to section 366.26, the juvenile court retains jurisdiction over the child until the legal guardianship is established. (§ 366.3, subd. (a) (section 366.3(a)).) Where a relative is appointed the legal guardian, and the child has been placed with the relative for at least 12 months, "the court *shall, except if the relative guardian objects, or upon a finding of exceptional circumstances,* terminate its dependency jurisdiction and retain jurisdiction over the child as a ward of the guardianship, as

---

[11] In *In re Rosalinda C., supra,* 16 Cal.App.4th 273, the issue was whether the trial court had authority to dismiss the proceedings where the minor was in long-term placement with her paternal grandmother in Mexico, but no formal legal guardianship had been established in this country, nor had its equivalent been established in Mexico. Rosalinda was born on May 2, 1988, and declared a dependent child on May 8. Prior to the 18-month hearing, she was found to be suffering developmental delays. In August 1990, the court found a substantial likelihood Rosalinda would not be adopted, ordered a permanent plan of long-term placement with the paternal grandmother, who lived in Mexico, and continued the matter to October for possible dismissal. It was reported that the Mexican Consulate had been contacted and a report on Rosalinda's status by a Mexican governmental agency requested; the Mexican Consulate had requested a home study from the Mexican Social Service Agency, which subsequently reported that Rosalinda was in good condition based on an unannounced home visit and follow-up call to Rosalinda's physician. On December 3, 1990, the court retained jurisdiction and continued the matter to June 1991. In May 1991, the family reunification worker reported the placement appeared stable and appropriate. The reunification worker had been unable to determine what legal standing the paternal grandmother had in Mexico with respect to guardianship of Rosalinda. After several more continuances, the social worker reported that the paternal grandmother's attorney in Mexico opined that the Mexican courts would recognize the juvenile court's placement of Rosalinda with her grandmother. Subsequently, the social worker spoke to another attorney in Mexico who explained that Mexican law does not provide for legal guardianships, but utilizes a process called "Patria Potestad"; the paternal grandmother had obtained a declaration of Patria Potestad which, the lawyer said, would be recognized by the Mexican authorities as giving the paternal grandmother de facto guardianship. (*Id.* at pp. 275-276.) At a subsequent hearing, the mother expressed concern that she had visited Rosalinda in Mexico and saw the father using intravenous drugs. The trial court found the paternal grandmother was adequately meeting Rosalinda's needs and dismissed the action. (*Id.* at p. 277.)

authorized by [section 366.4[12]]." (§ 366.3(a), italics added; see also Cal. Rules of Court, rule 1466(a) [providing for continued juvenile court jurisdiction after legal guardianship is granted, if continued jurisdiction *"is in the best interests of the child"* (italics added)].)

Thus, according to the plain language of section 366.3(a), the court *must* retain jurisdiction where the relative guardian objects to termination and may elect to retain jurisdiction where it finds exceptional circumstances, which, pursuant to California Rules of Court, rule 1466(a), may be established by a finding that the best interests of the child would be served by continued jurisdiction. Inasmuch as a finding of exceptional circumstances to warrant continued jurisdiction of the juvenile court may be based on a finding that continued jurisdiction is in the best interests of the child, the failure to consider the best interests of the child constitutes an abuse of discretion.

In *In re Twighla T.* (1992) 4 Cal.App.4th 799 [5 Cal.Rptr.2d 752] (*Twighla T.*), a mother appealed from an order granting legal guardianship of her son and daughter to their paternal aunt. She contended the trial court abused its discretion in granting guardianship and terminating jurisdiction instead of ordering long-term foster care with continuing jurisdiction, periodic reports, monitoring and assistance by social workers, because continuing jurisdiction was necessary to meet the daughter's special education needs and to assure the mother's visitation rights would not be frustrated by the guardian. (*Id.* at p. 805.) The appellate court affirmed the order terminating jurisdiction, finding the evidence supported the trial court's finding that the paternal aunt did not need department support to care for the children, the daughter's special education needs were being met in school and the guardian would be cooperative in allowing the mother reasonable visitation with the minors. (*Id.* at pp. 805-806.)

Here, unlike in *Twighla T.,* the trial court did not find the maternal grandmother did not need further department assistance. On the contrary, such a finding would have been unsupported by the undisputed evidence that the maternal grandmother was unable to meet the children's needs, particularly Joshua's special needs, without financial assistance. The maternal grandmother and the tribe were always frank with the department and the court about their inability to care for the children without financial assistance. The maternal grandmother at first declined to take the children because she feared she could not financially manage Joshua's special needs. The home study performed by the Canadian social services department stated the

---

[12]Section 366.4 provides: "Any minor for whom a guardianship has been established . . . pursuant to Section . . . 366.26 is within the jurisdiction of the juvenile court. For those minors, [provisions of the Probate Code] relating to guardianship, shall not apply."

maternal grandmother would require financial assistance to care for the children. At each stage of the proceedings the maternal grandmother was led to believe such assistance was available from the department. Other than the court's speculation that Canada would not let the children starve, there is not a scintilla of evidence the maternal grandmother did not need continued assistance from the department to care for the children.

Rather than considering the children's best interests, however, the record reflects the court focused on the burden to the court of regular review hearings until the children reached the age of majority, and on the equities of whether Canada or the department should provide the necessary financial assistance. For example, on January 28, 1999, when the court rejected the department's recommendation of long-term foster care to allow the maternal grandmother to continue receiving financial assistance, it stated: "These children are one and two. They reside in Canada. . . . [Long-term foster care] means 17 years of hearings every six months, 17 years of funding, and [the maternal grandmother is] quite clear that that's why she wants long term foster care because of the funding. Seventeen years, the State of California pays for these two children in Canada when the mother is up there also. Unacceptable."[13]

That the court's focus remained on the financial equities without consideration of the children's best interests is demonstrated by the following comments, made more than a year later, on April 24, 2000: "I understand the tribe's concern. I understand their information that the grandmother is absolutely indigent and can only keep the children if California pays for it. Canada is a big country, and it's hard for me to imagine that they'll let the children starve." "This is where we are. Either she adopts the children, *in which case she gets funding*, or we terminate jurisdiction today and Canada can pay for these children for the next 17 years. . . . [¶] . . . [¶] At [the next hearing], I will either terminate parental rights and institute a plan of adoption in Canada, or I will be terminating jurisdiction under a legal guardianship, and Canada can take care of the children as they choose. . . . This is not a case where the children are in America anymore. This is what the grandmother has requested. We have done our best to assist her." (Italics added.)

The following year on January 4, 2001, the court continued its misguided approach to the issue of terminating jurisdiction. After ascertaining the maternal grandmother was not receiving any financial assistance from California as the children's legal guardian, but would adopt them if it meant

---

[13]Although the record indicates mother was considering returning to Canada, there is nothing in the record to indicate that she ever did so. Meanwhile, the children remained citizens of the United States.

receiving financial assistance from California, the court stated: "In essence, we have a legal guardianship in full force and effect. We are not allowed to fund outside the United States. We have given her every opportunity that we can give her. She wants to keep her grandchildren with her. Apparently, they're doing well. Let the Canadian government handle this. It's not I.C.W.A. It has nothing to do with us."

At the hearing on April 9, 2001, the trial court was critical of the maternal grandmother and Wardell for seeking written assurances of financial assistance if she would adopt: "I will make it clear again. I don't like threats. The department is to tell this lawyer we do not give money to Canada. If the department believes that they can give money to Canadian children[14] after the adoption, that's up to them. [Ninety] days from now I will terminate parental rights, and we will enter in a plan of adoption with these children, or I will terminate jurisdiction, and that is exactly what I will do regardless of whether this attorney happens to be satisfied or not. It's between him and the government." On July 9, regarding Wardell's request for written confirmation that maternal grandmother would receive funding if she adopted the children, the juvenile court stated: "I frankly am getting very tired of grandma and the attorney that she was able to hire to get money out of the United States for these kids."

When, on January 7, 2002, the court terminated jurisdiction over the objection of the children's counsel, it stated: "It has been six years. We got her an attorney here.[15] We have done everything we can to work this out. . . . [¶] Grandmother is living in Canada. That's where she went with the children.[16] There is not a single, solitary thing California can do. We put the kids up there. That's where she is. . . . Jurisdiction is hereby terminated. [¶] . . . [¶] We acted in good faith every single step of the way. We have tried six ways to Sunday, and it isn't working to try to get her funding . . . . [¶] . . . I believe that the State of California did every single solitary thing it could to provide some money to this grandmother. These kids were otherwise adoptable. The grandmother lives in Canada. We did every single thing that was possible to try to get her some funding for these

---

[14]Contrary to the court's assertion, these are *not* Canadian children. These children were United States citizens, sent to live on an Indian Reserve in Canada by the California court, with assurances that California would provide financial assistance for their care. Once in Canada, they became dual citizens.

[15]The record does not reflect that the maternal grandmother was appointed a lawyer; the trial court's reference may have been to the children's California counsel.

[16]We observe that the maternal grandmother did not *go* to Canada with the children. The court sent the children to Canada to live with the maternal grandmother. The court did so with the understanding that she could not care for the children without financial assistance, which assistance the department promised her.

children. They live in Canada. They have lived in Canada for the last several years. [¶] The grandmother needs to now figure out in Canada what kind of funding is available for her grandchildren up there or what kind of funding is available through other means for American citizens residing in Canada. That's it. The department of social services can't do anything else."

It is apparent from the court's comments throughout the proceedings that it failed to consider the best interests of the children when it exercised its discretion to terminate jurisdiction. To fail to do so was an abuse of discretion. Accordingly, we remand for consideration of whether continued jurisdiction would be in the children's best interest, including consideration of whether the maternal grandmother can provide for the children's needs without financial assistance, whether financial assistance is available from Canadian sources, and, as we discuss further in the next section, whether it is available from California.

*In re Robert L.* (1998) 68 Cal.App.4th 789 [80 Cal.Rptr.2d 578] does not compel a contrary result. In that case, the issue was whether the trial court abused its discretion in continuing jurisdiction over a 20-year-old brother and his 18-year-old sister, who had been in long-term foster care with their maternal grandparents for almost 11 years and, at the time of the order, were attending college while continuing to live with the grandparents. The trial court's decision was based upon a finding that continued jurisdiction would allow the grandparents to continue receiving funding which would pay for the children's clothing, food and shelter, and thus allow the children to continue as full-time students. (*Id.* at p. 795.) The appellate court reversed, observing: "[E]xercise of jurisdiction must be based upon existing and reasonably foreseeable future harm to the welfare of the child. [Citation.]" (*Id.* at p. 794.) The court found, in the absence of any evidence the children were being physically, sexually or emotionally abused, neglected or exploited, or that such harm might occur in the future, continued jurisdiction "on the sole basis" that such would afford special assistance to allow the children to complete their college education, was an abuse of discretion. (*Id.* at p. 797.)[17]

Here the children have not reached the age of majority, as had the children in *In re Robert L., supra,* 68 Cal.App.4th 789. Nor are the children in this

---

[17]In that case, Robert was eight years old, and his sister Michelle was six years old when they and two other siblings were declared dependent children and placed with their maternal grandmother. The grandparents elected not to seek legal guardianship so that they would remain eligible to receive $700 per month in foster care benefits. Accordingly, when Robert was a few months short of his 10th birthday and Michele was eight, they and their siblings were placed in long-term foster care with the grandparents. The siblings all fared well with the grandparents and Robert was accepted at all of the universities to which he applied. Meanwhile, Michelle was also doing well in high school and hoped to follow her brother to university. Both continued to reside with their grandparents. (*In re Robert L., supra,* 68

case seeking continued jurisdiction to make them eligible for funds to allow them to be full-time college students. Rather, the undisputed evidence establishes the maternal grandmother cannot provide for the children's basic needs without financial assistance, and there was no evidence, as opposed to speculation, that such assistance was available from any source other than the department.

The department's assertion that the maternal grandmother agreed to accept financial responsibility for the children when she took them into her home in December 1997, is also unpersuasive. In October 1997, the maternal grandmother informed the department that she could not care for the children because of Joshua's special needs and the reservation's inability to provide financial assistance. The maternal grandmother's home was approved for placement based upon the home study, prepared by the Canadian social services, which concluded she would need financial assistance to care for the children. The maternal grandmother agreed to care for the children only after the department represented to her that it would provide financial assistance. There is no evidence that the maternal grandmother's financial condition improved between the time of the home study and when she signed the letter. The only reasonable inference from these facts is that the maternal grandmother signed the letter with the understanding that financial assistance would be provided by the department.

*Determination of Funding Availability*

■ The children contend the juvenile court should determine whether financial assistance is available to the maternal grandmother from California. We conclude a determination of the availability of financial assistance is a factor to be considered in determining the best interests of the children vis-à-vis termination of jurisdiction.

As we have already noted, section 11105, subdivision (d) provides that AFDC-FC payments are available to children placed outside of the state. Section 11101 provides in part: "When a recipient of public assistance is absent from the United States for a period in excess of 30 days, his aid shall thereafter be suspended whenever *need* cannot be determined for the ensuing period of his absence from the United States." (Italics added.) Thus, there appears no statutory bar to a child receiving AFDC-FC where that child has

Cal.App.4th at pp. 791-792.) At the review hearing in July 1997, when Robert was almost 20 and Michelle was 18, the social worker recommended termination of jurisdiction over Robert and Michelle. The grandfather explained that the loss of the financial aid they were receiving would create a financial burden. The trial court retained jurisdiction. (*Id.* at p. 792.) At review hearings in January 1998 and March 1998, over the department's objection, again the court retained jurisdiction. The department appealed. (*Id.* at pp. 792-793.)

been adjudicated a person described by section 300, removed from the home of his or her parents, and placed outside of the United States, where the child would otherwise be eligible for AFDC-FC payments based on established need.

Here, the children were adjudicated persons described by section 300, were removed from the their parents' home pursuant to a judicial determination that to not do so would be contrary to their welfare, the department was given the responsibility to care for and place the children, and the children were placed with their maternal grandmother in Canada as a result of a judicial determination. Thus, the children may have been eligible for AFDC-FC. To the extent the department promulgates regulations or policies contrary to the code, those regulations and policies are not enforceable. (See *Land v. Anderson* (1997) 55 Cal.App.4th 69, 82 [63 Cal.Rptr.2d 717], overruled by statute on another point.)

The children do not ask us to determine that funding from California is available or required, only that the juvenile court should hold a hearing on the issues, which it cannot do if jurisdiction is terminated. We agree and believe the trial court is in the best position to decide this question in the first instance.

DISPOSITION

The judgment is reversed. The matter is remanded to the trial court for consideration of whether circumstances exist warranting continued jurisdiction under section 366.3, subdivision (a) and whether the children are entitled to financial benefits.

Cooper, P. J., and Boland, J., concurred.