[No. S137583. June 7, 2007.]

In re JOSHUA S. et al., Persons Coming Under the Juvenile Court Law.
LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY
SERVICES, Plaintiff and Respondent, v.
PENNY S. Defendant;
JOSHUA S. et al., Appellants.

**COUNSEL**

Merrill Lee Toole, under appointment by the Supreme Court, for Appellants.

Laura Streimer, Lara J. Holtzman, Natasha Frost; Horvitz & Levy, David S. Ettinger and Mary-Christine Sungaila for The Alliance for Children's Rights as Amicus Curiae on behalf of Appellants.

Lloyd W. Pelham and Raymond G. Fortner, Jr., County Counsel, Larry Cory, Assistant County Counsel, Stephanie Jo Farrell and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

Bill Lockyer, Attorney General, Thomas R. Yanger, Assistant Attorney General, and Paul Reynaga, Deputy Attorney General, for Department of Social Services as Amicus Curiae on behalf of Plaintiff and Respondent.

Jennifer B. Henning for California State Association of Counties as Amicus Curiae on behalf of Plaintiff and Respondent.

OPINION

CHIN, J.—Under California law, when a child has been adjudged to be a dependent of the juvenile court, "the court shall . . . terminate its dependency jurisdiction" if "a relative of the child is appointed the [child's] legal guardian . . . and the child has been placed with the relative for at least 12 months," unless "the relative guardian objects" or "upon a finding of exceptional circumstances." (Welf. & Inst. Code, § 366.3, subd. (a).)[1] The Court of Appeal found that exceptional circumstances may exist in this case because the children, who were living with a relative guardian in Canada, would be eligible for aid under California's Aid to Families with Dependent Children-Foster Care (AFDC-FC) program (§ 11400 et seq.) were the juvenile court to change the guardianship to foster care. We granted review to consider the Court of Appeal's conclusion. For reasons set forth below, we reverse the Court of Appeal's judgment.

FACTUAL BACKGROUND

The long and tortured history of this case began more than 10 years ago, in July 1996, when Joshua S. was born with a positive toxicology for barbiturates. The next day, the Los Angeles County Department of Children and Family Services (Department) took him into custody, and in October 1996, the juvenile court adjudged him to be a dependent of the court under section 300. Joshua's brother, Alexander, was born in July 1997. Three months later, in October, the juvenile court adjudged him also to be a dependent of the court.

At the same time, the court ordered that both children be placed in Saskatchewan, Canada, with their maternal grandmother (Grandmother), who was already caring for another child of the boys' mother. Grandmother is a member of the Ahtahkakoop First Nation and lives on the Ahtahkakoop Reserve. Before making the placement order, the court received a "Home Study" prepared by the Saskatchewan Social Services Department (which is now called the Community Resources Department). The Home Study reported that Grandmother and her common law husband had a "[c]ombined family income [of] approximately $20,000 net," and stated: "A child placed in their care would not cause major financial stress, however, financial assistance is required." In announcing its order, the court noted: "[T]hey are requesting financing, and I do not believe that I can authorize funds to go out of the United States, and they are recommending alternative financial assistance. That would have to be up to the Canadian Government. I do not

---

[1] All further unlabeled statutory references are to the Welfare and Institutions Code.

know." The court also ordered that the boys' parents receive reunification services. The boys began living with Grandmother in Canada in December 1997.[2]

In April 1998, the court held a status review hearing pursuant to section 366.22. Before the hearing, the Department submitted a report recommending that the court terminate the parents' reunification services and select adoption as the permanent placement plan. The report explained that although Grandmother had initially expressed a desire to adopt, she had recently changed her mind and now wanted long-term foster care, because she did not want to terminate her daughter's parental rights or take away her daughter's incentive to "get herself together." Accompanying the report was a letter from the Ahtahkakoop Child & Family Services Agency (Agency) stating that the boys were now "members of the Ahtahkakoop Reserve," that the Agency was "opposed to adoption of any of our Band Member children," and that the Agency and "the Band" supported "long-term foster care" with Grandmother. At the hearing, counsel for the boys stated that the "tribe is sort of stating that they are not financially able to help this family out and understand that if we drop our jurisdiction, [Grandmother] will not get assistance." The court continued the matter and appointed an expert to, among other things, "inquire of the Tribes as to any funding issues." Three months later, in July 1998, it terminated the parents' reunification services and scheduled a permanency planning hearing under section 366.26.

Arriving at a permanent placement plan proved difficult. Initially, the Department favored adoption and told Grandmother that the boys "would be eligible for" both aid under the Adoption Assistance Program (AAP) and Medi-Cal services "until they reached the age of eighteen." However, Grandmother wanted long-term foster care instead, but was willing to consider adoption if she would otherwise lose the boys. The boys' counsel advocated for a third option—legal guardianship—arguing to the court that "this is not an adoption case" and that an adoption "just doesn't make sense." By January 1999, the Department had changed its recommendation to long-term foster care, citing funding issues and Grandmother's continuing opposition to adoption. Regarding the former, the Department reported that according to caseworkers in Canada, the boys were receiving monthly funding from the Canadian Department of Social Services, that Grandmother "would lose her funding for the boys, as well as free medical care," if she took legal guardianship, and that "the only way" she could "retain her funding and medical [was] to maintain [the boys] under long-term foster care."

The court found the recommendation "absolutely not acceptable," stating: Long-term foster care "means 17 years of hearings every six months, 17

---

[2] Before being placed with Grandmother, the boys lived with foster parents in California.

years of funding, and [Grandmother's] quite clear that that's why she wants long-term foster care because of the funding. Seventeen years the State of California pays for these two children in Canada when mother is up there also." The court also found "nothing" in the Department's report "indicat[ing] that these children [were] not adoptable." It therefore continued the matter for further study.

Over the next 10 months, the parties continued to explore various placement options. In July 1999, the Department reported that Grandmother still wanted long-term foster care, would consider legal guardianship if she would otherwise lose the boys, and needed "funding and medical coverage in order to care for her grandsons." The Department also reported that, according to Canadian caseworkers, Grandmother would continue to receive Canadian funding (but might lose medical care) under long-term foster care, and would lose funding (but retain medical care) under legal guardianship. Finally, the Department reported that, according to a representative of the "Revenue Enhancement, Special Payments Division," the Department "could fund the children in Canada as long as they are Title IV eli[g]ible and the court orders the department to fund the Canada placement on a minute order."[3] The court stated that it was "simply not comfortable with" long-term foster care under the circumstances, and directed the boys' counsel to prepare, and get Grandmother to sign, paperwork for legal guardianship.

In October 1999, the Department reported that Grandmother now was "committed to legal guardianship" and it recommended that the court appoint her as legal guardian. After noting it had explained, and Grandmother understood, "the legal and financial rights and responsibilities associated with legal guardianship," the Department stated: Grandmother "understands that with a court order, Los Angeles County will fund the boys at the rate of $560.00 per month, as court jurisdiction will not terminate, and that Canada Department of Social Services will provide medical insurance upon receipt of legal guardianship papers from this court." On October 22, 1999, the court appointed Grandmother as legal guardian, retained its dependency jurisdiction, and ordered the Department to, among other things, "ensure that *Youkim* [*sic*] funding continues to go to the legal guardian (in Canada)."[4]

---

[3] Title IV-E of the Social Security Act (42 U.S.C. § 670 et seq.) establishes a cooperative assistance program under which counties provide payments to foster care providers on behalf of qualified children in foster care, using a combination of federal, state, and county funds. California participates in this federal program through its AFDC-FC program.

[4] In *Miller v. Youakim* (1979) 440 U.S. 125 [59 L.Ed.2d 194, 99 S.Ct. 957] (*Youakim*), the United States Supreme Court held that relative caregivers are entitled to the same financial aid under what is now title IV-E as nonrelative caregivers.

Despite the caseworker's efforts, financial aid from California did not materialize. In December 1999, the "Technical Assistance Unit at the Adoptions Division" stated that it was "against department policy to send monthly funding out of the country." In February 2000, the "Special Payments Division" advised that although the Department "could send funding out of the country with a court order indicating to do so," "this specific case may be a problem as the caregiver is now the legal guardian and . . . was no longer considered a relative." In March 2000, a regional administrator stated that under section 45-303 of the California Department of Social Services's Manual of Policies and Procedures (MPP), "we cannot pay out of the country."

The possibility of adoption began to be explored, based on information that California funding might be available if Grandmother adopted the boys. However, in November 2000, the Department reported that Grandmother was "receiv[ing] monthly funding" and "medical care" from sources in Canada and did not want to adopt the boys, that she might consider that option if her funding were permanently terminated, but that even if she permanently lost all funding, she might " 'try to make things work out without the money.' " Grandmother later changed her mind, and in June 2001, she agreed to adopt the children if her attorney recommended she do so. Grandmother's attorney was demanding written assurance that Grandmother would receive AAP funds if she adopted the children.

No such assurances were provided. Instead, in December 2001, the Department told the court that AAP funds would not be available were Grandmother to adopt the boys while they all still lived in Canada. It also told the court that "[f]oster caretakers and legal guardians are only eligible to receive funding for children in their home if the family resides in the United States." It recommended that the court leave the legal guardianship in place and terminate its dependency jurisdiction. The court followed the recommendation, and on January 7, 2002, terminated its dependency jurisdiction.

The boys appealed, and the Court of Appeal reversed. (*In re Joshua S.* (2003) 106 Cal.App.4th 1341 [131 Cal.Rptr.2d 656] (*Joshua I*).) The court first reasoned that under section 366.3, subdivision (a), a juvenile court "may elect to retain [dependency] jurisdiction where it finds exceptional circumstances," and that under California Rules of Court, former rule 1466(a) (now rule 5.740),[5] exceptional circumstances "may be established by a finding that the best interests of the child would be served by continued jurisdiction." (*Joshua I, supra*, at p. 1353.) The court then found that the juvenile court had abused its discretion by failing to consider the best interests of the children

---

[5] All further rule references are to the California Rules of Court.

and focusing instead on the financial and administrative burdens that long-term foster care would impose on California. (*Id.* at pp. 1354–1356.) The court remanded the case for "consideration of whether continued jurisdiction would be in the children's best interest, including consideration of whether [Grandmother] can provide for the children's needs without financial assistance" and "whether financial assistance is available from . . . California." (*Id.* at p. 1356.) Regarding the latter consideration, although noting that the children had not requested a determination "that funding from California is available or required," the court nevertheless noted that "the children may have been eligible for" financial assistance under the AFDC-FC program. (*Id.* at p. 1358.) It stated: "[T]here appears no statutory bar to a child receiving AFDC-FC where that child has been adjudicated a person described by section 300, removed from the home of his or her parents, and placed outside of the United States, where the child would otherwise be eligible for AFDC-FC payments based on established need."[6] (*Joshua I, supra,* at pp. 1357–1358.)

In August 2003, after the case was remanded and the juvenile court retook dependency jurisdiction, the Department filed a progress report stating that Grandmother was receiving $540.00 per month from Canadian Social Services to support the children, additional money to support their older brother, and a monthly tax incentive. The report also stated that, according to Grandmother, "the Indian Tribe [was] assuring yearly medical and dental exams" and "school attendance," and was "assist[ing] [her] in meeting all of the children's needs." Finally, the report conveyed Grandmother's position that "the children [were] doing fine," that "she [did] not want anything from the court in California" and did not "want anyone calling and asking questions about the children, including social workers, or the courts," and that her family " 'want[ed] to be left alone.' " The report recommended that the juvenile court terminate its dependency jurisdiction.

On August 28, 2003, after a hearing, the juvenile court followed the recommendation and again terminated its dependency jurisdiction. The juvenile court found that the boys "apparently" were "thriving with their grandmother" in a safe, loving, and stable home, and that it was in their best interest to remain in that home. Regarding funding, the court first stated that "[w]hen a child in the State of California leaves the State of California for a legal guardianship in another state, we cannot provide funds to that state." After the children's counsel asserted that legal guardianship, rather than long-term foster care, had been chosen "only" because Grandmother "was

---

[6] The Department petitioned for review of *Joshua I*, arguing the Court of Appeal incorrectly held that "exceptional circumstances" under section 366.3, subdivision (a), may be established by a showing that the best interests of the child would be served by continued jurisdiction. We denied review. In this opinion, we express no view on this question, which the parties have not raised and which is beyond the scope of the issues on which we granted review.

told by the department" she "couldn't get the funding" otherwise, the court replied: "I'm not aware that children in another country can get funding if they are in long-term foster care." The court later declared: "I do not believe this court has the authority to provide funds for the grandmother in Canada, under any theory of law."

The boys again appealed, and the Court of Appeal again reversed. It first found that the children, notwithstanding their placement outside of the United States, would be eligible for AFDC-FC assistance were they placed in long-term foster care. It further found that because section 362, subdivision (a), gives a juvenile court "authority to make any and all reasonable orders for the[] maintenance and support" of a child who has been adjudged a dependent child under section 300, the juvenile court would have "the authority to order the department to make [AFDC-FC] payments" were the court to "place[]" the boys "in long-term foster care with [G]randmother in Canada." In reaching this conclusion, the Court of Appeal also found that the children were not required to exhaust administrative remedies before obtaining judicial relief, reasoning that pursuing such remedies would be futile in light of "the department's Manual of Policy and Procedures section 45-303," which "states that foster care payments may not be made outside of the country." The Court of Appeal next reasoned that "because the juvenile court was unaware of its authority to order funding" were it to place the boys in long-term foster care, "on this record it abused its discretion in terminating [its dependency] jurisdiction." In the Court of Appeal's view, because "the evidence of the children's well-being . . . was far from convincing," "[a]t a minimum," the juvenile court should have asked whether the children's counsel intended to file a section 388 petition to modify the legal guardianship to foster care "in order to possibly avail the children of the additional funding." After vacating the order terminating jurisdiction, the Court of Appeal stated: "On remand, the children should be permitted a reasonable opportunity to file a section 388 petition. If the children do not file such a petition, the juvenile court may reinstate the order terminating jurisdiction. If the children file a section 388 petition, we express no opinion as to how the juvenile court should rule, other than to observe that the children's best interests are paramount to the decision. [Citation.] Although we have held that funding is not unavailable simply because the children live in Canada, the juvenile court may be called upon to consider any number of factors in deciding whether to grant section 388 relief."

We granted the Department's petition for review.

## DISCUSSION

In its briefs, the Department launches a multipronged attack on the Court of Appeal's decision. The Department challenges both the substance of the

Court of Appeal's determination that the boys would be eligible for AFDC-FC payments were the guardianship changed to foster care, and the court's very power to make that determination. Before addressing the former, we consider arguments that implicate the court's power.

I. *The Children's Eligibility for AFDC-FC Was Before the Court of Appeal*

On several grounds, the Department argues that the question of the children's eligibility for AFDC-FC was not properly before the Court of Appeal. None of these arguments has merit.

The Department first asserts that because the juvenile court made no judgment or order "determining that the children were not eligible" for AFDC-FC, "there was nothing for the Court of Appeal to review." In making this assertion, the Department argues that the juvenile court found only that "it did not have the authority to determine if the children were entitled to [AFDC-FC] benefits." Thus, the Department argues, the Court of Appeal lacked jurisdiction to make an eligibility determination.

The record does not support the Department's argument. Just before the juvenile court announced its ruling, the Department argued that the children lost their "eligibility" for benefits when they moved to Canada and "lost their residency in the State of California." The juvenile court then stated that it was terminating its dependency jurisdiction, explaining in relevant part: (1) "these children are permanent residents of Canada"; (2) "[w]hen a child in the State of California leaves the State of California for a legal guardianship in another state, we cannot provide funds to that state"; (3) "[i]f we do long-term foster care in another state, we can" provide benefits; (4) "I am not aware that children in another country can get funding if they are in long-term foster care"; (5) "I do not believe that this court is empowered to grant funding to a relative in another country with children in a legal guardianship who are permanent residents of that country"; and (6) "I do not believe this court has the authority to provide funds for the grandmother in Canada, under any theory of law." Fairly read, these comments support the Court of Appeal's view that the juvenile court found "the children were not eligible for public assistance from California 'under any theory of law' because they had become residents of Canada." Indeed, contrary to its current position, in the Court of Appeal the Department similarly described the juvenile court's decision, stating: "The [juvenile] court found that the children were not eligible for funding from California because they were residing in Canada." On this record, the Department's argument fails.

The Department next argues that the children's notice of appeal was insufficient to put their AFDC-FC eligibility at issue. In making this argument, the Department cites the language of the notice, which stated that the children were appealing from the "[o]rders of the Juvenile Court issued August 28, 2003 terminating jurisdiction in this matter *without first resolving whether the children will continue to receive funding.*" (Italics added.) Based on the italicized language in the notice, the Department asserts that the children "did not even attempt to" appeal from an order actually "mak[ing] an eligibility determination." Thus, the Department argues, the Court of Appeal "had no jurisdiction to address or decide the [eligibility] issue."

■ The Department's overly technical attempt to parse the notice of appeal's language is unmeritorious. "[I]t is, and has been, the law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced." (*Luz v. Lopes* (1960) 55 Cal.2d 54, 59 [10 Cal.Rptr. 161, 358 P.2d 289]; see also rule 8.100(a)(2) ["notice of appeal must be liberally construed"].) A notice of appeal "is sufficient if it identifies the particular judgment or order being appealed." (Rule 8.100(a)(2).) The notice in this case clearly met this requirement by identifying the juvenile court's order of "August 28, 2003 terminating jurisdiction in this matter." To the extent, if any, the phrase "without first resolving whether the children will continue to receive funding" created ambiguity, "there is no showing" that the Department was "or could have been misled or prejudiced because of the [arguably] ambiguous language." (*Luz, supra,* at p. 60.) Thus, the Department is incorrect in asserting that the notice of appeal was insufficient to give the Court of Appeal jurisdiction to review the juvenile court's eligibility determination.

The Department also argues that because the children never applied for AFDC-FC, "the issue of whether [they] were eligible for AFDC-FC benefits was not ripe for review by any court." According to the Department, "[u]ntil the children apply for and are denied AFDC-FC benefits, the laws and regulations governing their eligibility generate no more than a difference of opinion."

■ For several reasons, we reject the Department's ripeness argument. First, the Department did not make the argument in the Court of Appeal. "As a policy matter," we "normally will not consider an issue that the petitioner failed to timely raise in the Court of Appeal." (Rule 8.500(c)(1).) Second, the argument fails on its merits. The issue before the juvenile court was whether "exceptional circumstances" existed such that it should not terminate its dependency jurisdiction notwithstanding the children's placement for at least

12 months with a relative whom the court had appointed their legal guardian. (§ 366.3, subd. (a).) Under *Joshua I*, to answer that question, the court had to determine, among other things, whether the children would be eligible for AFDC-FC benefits were it to retain jurisdiction and change the guardianship to foster care. Thus, contrary to the Department's assertion, the "ripeness requirement," which "prevents courts from issuing purely advisory opinions, or considering a hypothetical state of facts in order to give general guidance rather than to resolve a specific legal dispute" (*Hunt v. Superior Court* (1999) 21 Cal.4th 984, 998 [90 Cal.Rptr.2d 236, 987 P.2d 705]) was satisfied in this case.

## II. *Exhaustion of Administrative Remedies*

In the Court of Appeal, the Department argued that a judicial determination of the children's eligibility for AFDC-FC benefits was unavailable until the children invoked and exhausted the administrative process for obtaining AFDC-FC benefits by filing an application for benefits and requesting a hearing were the application denied. In rejecting this claim, the Court of Appeal first found that because section 362, subdivision (a), gives a juvenile court "authority to make any and all reasonable orders for the[] maintenance and support" of a child who has been adjudged a dependent child under section 300, a juvenile court "has the authority to order the department to make [AFDC-FC] payments" were the boys "placed in long-term foster care with [G]randmother in Canada." It then found that the children did not have to pursue administrative remedies before obtaining judicial relief, reasoning that " 'resort to the administrative process would be futile because it is clear what the agency's decision would be.' " The court explained: "[T]he department's Manual of Policy and Procedures section 45-303 states that foster care payments may not be made outside of the country. Thus, it seems clear that the agency—in this case the department—relying on its own Manual of Policy and Procedures, would decide that foster care payments could not be made to the children because they have been placed with grandmother in Canada. Since the result of the administrative process is obvious, there would be no benefit to requiring the administrative proceedings to take their course."

The Court of Appeal's analysis is flawed in several respects. First, the court erred in finding that section 362, subdivision (a), gives the juvenile court "authority to order the department to make [AFDC-FC] payments" without an *administrative* determination of the children's eligibility for those payments. Section 362, subdivision (a), provides in part that a juvenile court "may make any and all reasonable orders for the care, . . . maintenance, and support" of a child who has been adjudged a dependent child under section 300, and "may, after giving notice and an opportunity to be heard, join in the juvenile court proceedings any agency . . . that the court determines has failed

to meet a legal obligation to provide services to the child." However, this section also provides that a juvenile court "has no authority to order services *unless it has been determined through the administrative process of an agency* that has been joined as a party, that the child is eligible for those services." (§ 362, subd. (a), italics added.) The plain language of this provision establishes that a juvenile court may not order the Department actually to make AFDC-FC payments—i.e., to provide services—unless the administrative process is invoked *and* it is determined through that process that the children are eligible for AFDC-FC payments. The Court of Appeal erred insofar as it held otherwise.[7]

■ Second, the Court of Appeal's justification for applying the futility exception—its assumption that the Department would follow section 45-303 of the MPP—is inconsistent with our case law. In *Lindeleaf v. Agricultural Labor Relations Bd.* (1986) 41 Cal.3d 861, 869 [226 Cal.Rptr. 119, 718 P.2d 106], the petitioner sought to challenge an agency's regulations in court without first raising his objection in the administrative process. In finding that the petitioner had failed to exhaust his administrative remedies, we first explained that "courts ordinarily accord administrative agencies the initial opportunity to address claims involving interpretation of their own regulations . . . ." (*Ibid.*) We then rejected the petitioner's reliance on the "futility exception" to the exhaustion requirement, explaining: "The futility exception . . . demands that the petitioner state with assurance that the [agency] would rule adversely in [the petitioner's] own particular case. [Citations.] Because the issue had never been presented to the [agency], its probable decision could not be forecast. To permit [the petitioner] retroactively to second-guess the [agency] would improperly dilute the [agency's] power to 'make, amend, and rescind' its own regulations. ([Lab. Code,] § 1144.)" (*Lindeleaf, supra,* 41 Cal.3d at p. 870.) Similarly, here, as far as we know, the validity of section 45-303 of the MPP has never been challenged in administrative proceedings. Therefore, under *Lindeleaf,* the Court of Appeal erred in concluding that it would be futile to do so.

■ Ultimately, however, for a different reason, we agree with the Court of Appeal that the exhaustion requirement's futility exception applies. Under California law, a child placed in the "approved home of a relative" is not eligible for AFDC-FC unless "the child is otherwise eligible for federal financial participation in the AFDC-FC payment" (§ 11402, subd. (a)), which means that "the payment is consistent with an approved state plan under Section 671 and following of Title 42 of the United States Code, authorizing federal financial participation in the payment" (§ 11402.1). As relevant to the exhaustion issue, the cited federal statutes authorize federal participation in

---

[7] We disapprove *In re Joshua S., supra,* 106 Cal.App.4th 1341, to the extent it is inconsistent with this conclusion.

payments made only to children "in foster family homes or child-care institutions." (42 U.S.C. § 674(a)(1); see also 42 U.S.C. § 672(a) [requiring states with approved plans to make payments if, among other requirements, the child "has been placed in a foster family home or childcare institution"].) Because the juvenile court placed the children under legal guardianship rather than in foster care, they were not living in a foster family home or childcare institution, and thus were not eligible for federal participation.[8] Therefore, it clearly would have been futile for the children to have applied for AFDC-FC while they were under legal guardianship. Thus, the boys' failure to apply for AFDC-FC benefits did not preclude either the juvenile court or the Court of Appeal from considering whether, because of their placement outside of the United States, they would be ineligible for AFDC-FC even were the juvenile court to place them in foster care. To that issue, we now turn.

### III.   *The Children Are Ineligible for AFDC-FC Payments*

As explained earlier, under California law, a child placed in the "approved home of a relative" is not eligible for AFDC-FC unless "the child is otherwise eligible for federal financial participation in the AFDC-FC payment." (§ 11402, subd. (a).) The Department argues that were the juvenile court to change the boys' placement in Canada to foster care, they would not be eligible for federal financial participation—and thus would be ineligible for AFDC-FC—because they would fail to meet the federal requirement that they be "placed in a foster family home." (42 U.S.C. § 672(a).) For reasons that follow, we agree.

For purposes of this requirement, federal law defines a "foster family home" as "a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing." (42 U.S.C. § 672(c).) In context, the term "such State" refers to "the State in which [the foster home] is situated," and the statute therefore requires that the foster home be either "licensed by the State in which it is situated" or approved "by the agency" of the state *in which it is situated* having responsibility for licensing foster homes. (*Ibid.*) Because Canada is not a "State" for purposes of this provision (see 42 U.S.C.

---

[8] For purposes of federal eligibility, "the term 'foster family home' means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing," and "the term 'child-care institution' means a private child-care institution, or a public child-care institution which accommodates no more than twenty-five children, which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing or approval of institutions of this type, as meeting the standards established for such licensing . . . ." (42 U.S.C. § 672(c).)

§ 1301(a)), Grandmother's home is not in a state, it cannot be licensed or approved by the state "in which it is situated," and it cannot qualify as a "foster family home" for purposes of federal financial participation in AFDC-FC payments. (42 U.S.C. § 672(c).) For this reason, federal financial participation would be unavailable were the juvenile court to place the children in foster care with Grandmother in Canada.

■ These conclusions are consistent with other provisions of federal law that indicate Congress's intent to extend eligibility for federal financial participation only to children placed in foster homes within the United States and its territories. To be federally approved, a state's plan must, among other things, "provide[] for a case review system" (42 U.S.C. § 671(a)(16)), i.e., a procedure for assuring that each child has a "case plan" that meets certain basic requirements (42 U.S.C. § 675(5)). Additional requirements apply if a child is placed "in *a State* different from the State in which [his or her parents'] home is located." (42 U.S.C. § 675(5)(A)(i), italics added.) In this circumstance, the case plan must specify the reasons why the placement in a different "State" is in the child's best interests (*ibid.*) and must require that a caseworker from "the State" in which the parents live, "the *State* in which the child has been placed," or "a private agency under contract with either such *State*, visit such child in such home" at least every six months. (42 U.S.C. § 675(5)(A)(ii), italics added; see also Safe and Timely Interstate Placement of Foster Children Act of 2006, Pub.L. No. 109-239, § 6 (July 3, 2006) 120 Stat. 512.) For purposes of this provision, the term "State" includes certain United States territories, but it does not include either Canada or any other foreign country. (42 U.S.C. § 1301(a)(1).) The most—perhaps the only—plausible reason for Congress's failure to provide that foreign placements are subject to the additional requirements applicable to interstate placements is its understanding that children placed in foster care in other countries are simply not eligible for federal financial participation. Thus, that Congress specifically addressed children placed in other states and United States territories, but made no mention of children placed in other countries, supports the conclusion that were the juvenile court to change the boys' placement in Canada to foster care, they would not be eligible for federal financial participation.

■ Recent federal legislation reinforces this conclusion. In July 2006, the United States Congress passed the Safe and Timely Interstate Placement of Foster Children Act of 2006 (Pub.L. No. 109-239 (July 3, 2006) 120 Stat. 508) (Act). The Act declared that "[f]ederal policy should encourage the safe and expedited placement of children into safe, permanent homes *across State lines.*" (*Id.*, § 2, italics added.) Among other things, the Act added several new requirements for federal financial participation in foster care payments: a state's plan must " 'provide that the State shall have in effect procedures for the orderly and timely *interstate* placement of children' "; that "the State" shall, within 60 days of receiving from "another State" a request for a home

study assessing the safety and suitability of placing a child in the home, conduct and complete the study; and that a "State" must treat any such report received from " 'another State or an Indian tribe (or from a private agency under contract with another State) as meeting any requirements imposed by the State for the completion of a home study before placing a child in the home.' " (*Id.*, §§ 3 & 4, 120 Stat. 508-509, adding 42 U.S.C. § 671(a)(25) & (26), italics added.) Neither Canada nor any other foreign country is a "State" within the meaning of these provisions (42 U.S.C. § 1301(a)(1)), and again, the most plausible reason for Congress's failure to provide that foreign placements are subject to the new requirements the Act imposed on interstate placements is its understanding that children placed in foster care in other countries are not eligible for federal financial participation. Indeed, our review of the congressional debates regarding the federal statutes discussed above reveals no hint that Congress has provided, or intended to provide, for federal financial participation in payments to children placed in foster care outside of the United States.

Contrary to the assertion of amicus curiae The Alliance for Children's Rights, the decision in *Youakim, supra,* 440 U.S. 125, does not require a different conclusion. There, based in part on legislative history, the high court held that placement in the home of a relative does not render a child ineligible for the federal foster care benefit program. (*Id.* at pp. 138–143, 146.) However, the court based its holding primarily on the "sweeping language" of the relevant statutes, which "manifestly [does] not limit" eligibility to children placed in "the homes of nonrelated caretakers" (*id.* at p. 135) and "plainly states that a foster family home is the [licensed or approved] home of any individual" (*Id.* at pp. 137–138). The court's discussion of the legislative history merely "fortif[ied]" its reading of the statutes' plain language. (*Id.* at p. 138.) Here, by contrast, as demonstrated above, the plain language of the relevant statutes does *not* support the boys' interpretation, and in construing a statute, we look first to its language. (*People v. Murphy* (2001) 25 Cal.4th 136, 142 [105 Cal.Rptr.2d 387, 19 P.3d 1129].) Moreover, the high court in *Youakim* relied on an administrative interpretation that expressly supported its conclusion. (*Youakim, supra,* 440 U.S. at pp. 143–144.) We have found no administrative interpretation supporting the boys' position in this case. Finally, *Youakim*'s discussion of the legislative history did not examine whether Congress intended to send federal funds out of the country, because the facts of that case did not implicate this question. For these reasons, *Youakim* is inapposite.

Based on the above, we conclude that were the juvenile court to place the boys in foster care with Grandmother in Canada, they would not be

eligible under federal law for federal financial participation in any AFDC-FC payment and, therefore, would not be eligible for AFDC-FC.[9]

## DISPOSITION

The Court of Appeal's judgment is reversed and the matter is remanded for further proceedings consistent with this opinion.

George, C. J., Kennard, J., Baxter, J., Werdegar, J., Moreno, J., and Corrigan, J., concurred.

---

[9] Given our conclusion, we need not, and do not, address the following arguments: (1) the boys would not meet the requirement for federal financial participation that their "placement and care are the responsibility of . . . [¶] . . . the State agency administering" the state's federally approved foster care maintenance payment plan or "any other public agency with which" that state agency "has made an agreement which is still in effect" (42 U.S.C. § 672(a)(2)(B)); (2) because the boys are Canadian residents, they are ineligible under California's general residency requirements for recipients of public assistance; (3) the evidence failed to establish the boys' need for financial assistance from California; and (4) a court order mandating payment of AFDC-FC payments to the children would result in an illegal expenditure of public funds and would violate the separation of powers doctrine.