Filed 2/28/13  In re B.B. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re B.B. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. N.B., Defendant and Appellant. | E056793 (Super.Ct.Nos. J232716 & J232717) OPINION |

APPEAL from the Superior Court of San Bernardino County.  Christopher B. Marshall, Judge.  Affirmed.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Jean-Rene Basle, County Counsel, and Adam E. Ebright, Deputy County Counsel, for Plaintiff and Respondent.

I

INTRODUCTION[1]

N.B. is the mother of three children born between 2004 and 2010. The two older children are D.A. and B.B., born in 2004 and 2006, and their fathers are M.A. and J.S. respectively. Mother was the subject of child welfare referrals in May and June 2004 and November 2009. The third child, L.V., an infant, died in May 2010 of injuries inflicted by L.V.'s father, B.V.

Mother appeals from orders denying her section 388 petition and terminating her parental rights to B.B. under section 366.26. D.A. has been placed with M.A., her father. Mother asks this court to review the record independently for any cognizable issues involving D.A.

Based on our independent review, we conclude the juvenile court did not abuse its discretion in denying mother's request for a bonding study involving B.B. and we discern no issues affecting D.A.'s placement with her father. Therefore, we affirm the orders of the juvenile court.

II

FACTUAL AND PROCEDURAL BACKGROUND[2]

In May 2010, after L.V. died, Children and Family Services (CFS) for the County of San Bernardino initiated juvenile dependency proceedings as to D.A. and B.B, then

---

[1] All statutory references are to the Welfare and Institutions Code.

[2] The full previous history of this case is presented in E053319, pages 3 through 11.

about six and four years old.  In April 2011, the children were declared dependents under section 300, subdivisions (a), (b), (c), (f), (i), and (j).  The juvenile court denied family reunification services for mother under section 361.5, subdivisions (4), (6), and (7), and this court affirmed.

D.A.'s father, M.A., was admonished for engaging in an inappropriate relationship with mother.  Nevertheless, a case plan was approved for M.A.  Both children were placed with Mr. and Mrs. A., D.A.'s paternal grandparents.

A.  *The October 2011 Status Review Report*

The October 2011 status review report included the information that mother was never married to D.A. or B.B.'s fathers.  Both men were on their respective children's birth certificates but J.S. had not supported B.B. or been in contact with him since infancy.

CFS concluded that M.A. had failed to protect D.A. after learning that B.V. had treated her roughly before L.V. died.  M.A. had been receiving therapy to learn how to set boundaries with mother and to parent his daughter.  M.A. was cooperative and actively involved with both children.  He was employed with suitable housing.  He had completed a parenting course.  M.A. understood why the children had been removed and could not be in mother's company.  If M.A. was granted custody of the children, he intended to live with his parents to provide parenting support.  The prognosis for reunification with D.A. was good.

J.S. had been attending parenting and substance abuse classes and had three negative drug tests. J.S. was also taking an active role in B.B.'s life. He was working and living with a friend. The prognosis for reunification with B.B. was fair.

When mother participated in monthly visits of two hours, both children had reacted adversely. D.A.'s negative behaviors included "defiance, talking back in disrespect, crying uncontrollably, yelling and screaming." B.B. also became defiant and argumentative. D.A. was in first grade and B.B. was in kindergarten. They were both receiving therapy and enjoyed living with D.A.'s paternal grandparents.

In the November 2011 addendum report, CFS recommended that D.A. be placed with M.A., B.B. remain with M.A.'s parents, and services for J.S. be terminated. CFS noted that, while previously M.A. had not been honest in therapy about his relationship with mother, he was making progress. He was also having successful unsupervised, overnight visitation with the children. CFS recommended D.A. be returned to M.A.'s care and family maintenance services be provided.

J.S. had been erratic in participating in services and visitation. He had a positive drug test in February 2011. CFS recommended that his services be terminated and M.A.'s parents be considered for potential adoption.

In January 2012, the court ordered D.A. returned to the custody of M.A. with family maintenance services. Mother continued to have monthly supervised visitation for two hours. The court terminated J.S.'s services.

4

*B.  Section 366.26 Reports*

In May 2012, CFS recommended that parental rights for B.B. be terminated.  B.B., then age five, was a healthy child who required dental care to have numerous teeth capped due to "bottle rot."  He was conversational and had stopped stuttering.  He still mentioned the circumstances of his sister's murder but he demonstrated emotional resilience.  He performed well in kindergarten and was demonstrative and affectionate.

Mr. A., a firefighter, and his wife, a homemaker, have been married since 1971 and raised four children.  Mr. and Mrs. A. are the paternal grandparents of B.B.'s half-sister, D.A.  M.A. was living with his parents and the children.  Mr. and Mrs. A. expressed great enthusiasm for adopting B.B.  Meanwhile J.S. had engaged in a poor pattern of visitation and participation in reunification services.  CFS recommended the parental rights for B.B. be terminated and B.B. be placed for adoption with Mr. and Mrs. A.

In July 2012, M.A. was still gainfully employed and living with his parents and the two children.  D.A. was happy and continuing to improve.

*C.  Mother's Section 388 Petition*

On May 15, 2012, mother filed a section 388 petition, asking for the return of the children to her custody.  In the alternative, she requested that parental rights for B.B. not be terminated and the court order a bonding study.  In addition, she requested a legal guardianship, rather than adoption, for B.B., and reinstatement of reunification services for D.A., plus an increase in visitation to a two-hour weekly visit with both children.

In support of her petition, mother acknowledged that she had failed to protect her children from harm, resulting in L.V.'s death. Mother had been receiving private counseling at her own expense beginning in October 2011. Mother stated that she had learned how to be more active in caring for her children and diligent in recognizing abuse and seeking medical care. Mother had disassociated from B.V. and had cooperated in the prosecution of him. B.V. had pleaded guilty and been sentenced to 20 years in prison. Mother had secured a clean, safe home where she lives alone. She had been employed since 2004 and had been promoted to assistant general manager. During regular visitation, she had behaved appropriately. She asserted she was able to provide for her children's emotional, medical, and financial needs and it would be in the best interest of the children because they wanted to live with her and they loved one another.

In an interim review report, CFS recommended the court deny mother's petition based on changed circumstances because mother had previously denied knowing about the abuse of the children by B.V. and did not seek timely medical care for L.V. before she died. CFS focused on how B.B. and D.A. were thriving in their placement with Mr. and Mrs. A. Both children had suffered trauma under their mother's care but were overcoming its effects. CFS summarized mother's history of referrals in May and June 2004 and November 2009 for abuse and neglect, culminating in L.V.'s death in May 2010. CFS disagreed with the therapist's assessment that mother had come to recognize her culpability. CFS acknowledged mother loves the children and was appropriate in visitation but observed the children did not exhibit emotional distress when the visits ended. Therefore, CFS still recommended that B.B. should be adopted and D.A. should

6

be placed with her father, M.A., aided by his parents.  CFS identified no change in circumstances.

In addition to CFS's opposition, minor's counsel for B.B. opposed the request for a bonding study on the grounds he had not been in mother's care since May 2010 and mother saw him only once a month for two hours.

The trial court granted an evidentiary hearing on the section 388 petition but denied the request for a bonding study.

*D.  Hearing on Sections 388 and 366.26*

On July 26 and 27, 2012, the court conducted a combined hearing on the section 388 petition and the section 366.26 proceeding.

Gail York, mother's therapist, testified that she had begun treating mother in October 2011 for 15 sessions.  Mother was not in contact with B.V. who had killed their daughter.  The therapy focused on "protection issues" and mother's need to recognize and be vigilant about danger to her children.  Mother admitted her past faults in the care of her children, especially in not recognizing B.V.'s abusive treatment of them even after they had disclosed it to her.  Although York never met the children, in her opinion, the children had probably bonded with mother based on their history with her until their removal.  York also asserted that mother did not pose a risk and could parent the children safely.

Mother testified that, at one point, the family law court had ordered M.A. to have custody of D.A. for about a year.  Mother also testified that she learned in therapy how to

7

be an alert and active parent. She acknowledged having a part in the death of L.V. and knowing about B.V.'s mistreatment of the children before L.V. died.

Annette Femi-Grande, the children's therapist, testified that she treated them weekly and then every other week. Initially, the children experienced nightmares, flashbacks, crying, depression, and anger related to L.V.'s death. They suffered from post-traumatic stress disorder and difficulty sleeping. The children have improved but, after mother's visits, their symptoms seemed to be aggravated. Femi-Grande's opinion was that mother's visits should be terminated and they should not be returned to her. Both children preferred placement with M.A. and Mr. and Mrs. A.

The social worker testified the children enjoyed their visits with mother but were not upset when they ended. She recommended that B.B. be adopted by Mr. and Mrs. A. and have no more contact with mother and that M.A. have sole custody of D.A. and mother have monthly, supervised visitation.

At the conclusion of testimony, mother's lawyer argued that if the section 388 petition was denied, she should have increased unsupervised visitation with D.A. and joint legal custody and that an alternative to adoption be ordered for B.B.

The court denied the section 388 petition as not establishing changed circumstances or the best interests of the children. As to B.B., the court granted termination of parental rights, finding by clear and convincing evidence that it was likely he would be adopted and that termination of parental rights would not be detrimental and the beneficial relationship exception was not established. As to D.A., the court ordered M.A. to have legal custody and mother to have monthly supervised visitation. The court

8

terminated dependency jurisdiction and ordered that any further proceedings regarding

custody of D.A. should be conducted in the family law court.

## III

## THE BONDING STUDY

Mother argues the juvenile court abused its discretion by denying her request in

May 2012 for a bonding study involving her and B.B. The court denied the bonding

study, because it was not "appropriate or reasonable under the circumstances."

The parties initially argue about whether the issue involving the bonding study

was forfeited or waived on appeal. In this instance, we conclude the right of appeal

should be liberally construed to protect the appellant. (*In re Joshua S.* (2007) 41 Cal.4th

261, 272; *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1149-1451.)

Even so, we still decide the issue on the merits against mother. In *In re Lorenzo

C.* (1997) 54 Cal.App.4th 1330, 1341, the appellate court discussed the standard of

review for the denial of a bonding study and commented: "[I]t is difficult to envision

how the court abused its discretion by not ordering a bonding study in this case. The

applicable standard of review is whether, under all the evidence viewed in a light most

favorable to the juvenile court's action, the juvenile court could have reasonably

refrained from ordering a bonding study. [Citation.] Here, the undisputed evidence was

that there was some bonding between the father and Lorenzo but that the child had a

stronger bond with the foster parents. [Fn. omitted.] Also, the child was only two years

old at the time of the section 366.26 hearing and had had no contact with his father during

the preceding five months. Under these circumstances, it is unlikely that a bonding study

9

would have been useful to the juvenile court. The juvenile court did not err in not ordering a bonding study."

A later case repeated the holding that there is no requirement in statutory or case law that a court must secure a bonding study as a condition precedent to a termination order. Family preservation ceases to be of overriding concern if a dependent child cannot be safely returned to parental custody and the juvenile court terminates reunification services. Then, the focus shifts from the parent's interest in reunification to the child's interest in permanency and stability. (*In re Richard C.* (1998) 68 Cal.App.4th 1191, 1198, citing *In re Lorenzo C., supra,* 54 Cal.App.4th at pp. 1339-1340.

The same reasoning applies here, as in *Lorenzo C.* and *Richard C.*, for the reasons discussed above in detail in the statement of facts, section II, D and E. In summary, B.B. had developed an intense emotional bond with Mr. and Mrs. A. who wanted to adopt him and keep him in their home with his sister and her father. B.B. was only three years old when he was removed from his mother. He had been out of her care for two years in May 2012 and he saw her only once a month. As the juvenile court expressly found, the mother's therapist had no sound basis for her opinion that B.B. may still have maintained an attachment to mother because the mother's therapist never observed their interaction. Instead, the children's therapist described how any contact with mother seemed to aggravate and renew the trauma the children had already suffered and continued to be harmful to them. Under these circumstances, as recognized by the juvenile court, it simply was not an abuse of discretion to deny mother's request for a bonding study and the denial presented no prejudice to her rights concerning B.B.

10

IV

DISPOSITION

We affirm the orders of the juvenile court.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
J.

We concur:


HOLLENHORST
Acting P. J.


McKINSTER
J.

11