Filed 5/6/15  In re C.O. CA4/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re C.O., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>B.A.,<br><br>    Defendant and Appellant. | G050821<br><br>(Super. Ct. No. DP024112)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

Rich Pfeiffer, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel, for Plaintiff and Respondent.

No appearance for the Minor.

\*            \*            \*

Appellant B.A. (mother) contends the court erred in terminating her reunification services at the 12-month review hearing because she had not been provided with a mental health evaluation or reasonable mental health services. We reject her argument inasmuch as the record clearly reflects that she did indeed receive a mental health evaluation and extensive therapy sessions, and that she repeatedly refused other mental health related services. We affirm.

I

SCOPE OF APPEAL

In her notice of appeal, mother challenged the termination of reunification services with respect to her younger son, C.O. In her briefing on appeal, B.A. also contends she did not receive reasonable reunification services with respect to her older son, L.P., who is now 18 years old.

While it is true that a notice of appeal is "'liberally construed so as to protect the right of appeal if it is reasonably clear what [the] appellant was trying to appeal from'" (*In re Joshua S.* (2007) 41 Cal.4th 261, 272), here there was no indication that mother was trying to appeal from the order with respect to L.P. Although the notice of appeal provided spaces for mother to identify both of her children by name and birth date, she listed only C.O., not L.P. Inasmuch as the notice of appeal applies only to the order with respect to C.O., that is the only order we will address.

II

DISCUSSION

A. *Background:*

*(1) Detention—*

A Welfare and Institutions Code section 300, subdivision (b) juvenile dependency petition was filed on August 22, 2013 with respect to C.O., then age 8, and L.P., then age 16. It alleged that, five days earlier, mother had been beaten by her live-in boyfriend, a man she knew to be a registered sex offender, in the presence of C.O.

2

Mother purportedly told L.P. to take C.O. away before he could be interviewed by the police, but L.P. failed to do so. Mother then cursed at him and blamed him for the arrest of her boyfriend.

The petition further alleged that the boyfriend previously had caused C.O. to sustain a bloody nose and that mother had told C.O. not to report the matter. It also alleged that the boyfriend smoked "weed" and drank alcohol in front of C.O. and that mother herself had a substance abuse history. In addition, it noted mother had an arrest record for using controlled substances, receiving stolen property, transporting illegal aliens, and reckless driving. C.O. and L.P. have different fathers, both of whom are in Mexico.

The August 22, 2013 detention report stated that mother was taken to the hospital as the result of the beating. The children were taken into protective custody on August 20, 2013. They were each left in the care of different family members. L.P. reported that he and mother had fought at some point and that he had sustained bruises in the past. There were prior substantiated child abuse reports with respect to each child.

At the detention hearing, mother requested that C.O. be released to her. However, counsel for C.O. stated he did not want to be released to her. The court ordered both children detained.

*(2) Jurisdiction and Disposition—*

At the time of the September 20, 2013 jurisdiction/disposition report, C.O. and L.P. were each living with different maternal aunts. L.P. reported being quite happy living with his aunt and said there was nothing he had liked about living with mother. L.P. said mother was always in a bad mood and picked fights with him almost daily. He said "mother would often tell him, 'I hate you. I hope that you don't turn out good in life.'" L.P. also said she would leave him to take care of C.O., and then she would come home smelling of beer and would throw up. He said he did not want to visit with mother, that he was afraid of her. He also said she was continuing to send him threatening text

3

messages. He showed the social worker some of them, including one that said, "I will see u in hell."

C.O. also said he liked living with his aunt a lot. He further stated he did not want to visit mother right then, because he was afraid of her boyfriend.

During her interview, mother admitted she began using drugs at age 15, but said she had stopped. She admitted to multiple arrests and to having served 15 months for "'adding and abetting.'" (Error in original.) Mother acknowledged that she was seeing a psychiatrist, Dr. Brown, for depression, and that she was taking Xanax and Zoloft.

The social worker met with the aunt taking care of L.P. The aunt said mother had "a history of blaming everyone and never accepting her faults." She also said it was difficult to get along with mother. She explained: "She is just not normal. She has been diagnosed as Bi-polar and I don't know if she ever takes her medication. She is always angry at something or someone. She gets way too angry." She also expressed concern that mother continued to use drugs and might even be engaging in prostitution to buy the drugs.

The social worker also met with the aunt taking care of C.O. She, too, expressed concerns that mother continued to use drugs. She said she would not let mother visit with C.O. the last time she came by, because she thought mother was "high."

Mother plead nolo contendere to the juvenile dependency petition as amended by interlineation. The court found the allegations of the amended petition to be true and ordered the children declared dependent children of the Orange County Juvenile Court.

*(3) Six-Month Review—*

As of the date of the six-month review hearing, in March 2014, the children remained in the care of the maternal aunts.

Mother had been having regular monitored visits with C.O., twice a week. By and large, her visits with C.O. were positive and demonstrated a good relationship between the two. On one occasion, however, a visit was terminated early because of mother's angry and aggressive behavior towards the monitor. The child then refused to attend the next scheduled visit because he was afraid mother would be mad and he did not want her to be rude to the monitor.

L.P. continued to refuse to see mother. According to his therapist, L.P. reported that mother had been very neglectful of him and C.O. by not providing for their basic needs, and that mother had been verbally and emotionally abusive towards him for many years. He did not want to see her. The therapist said L.P. showed signs of posttraumatic stress disorder, and she opined that if he were pressured to see mother before he was ready, it could "re-traumatize him."

The social worker reported that family members were concerned that mother had expressed suicidal ideation and had left a strange text message for the maternal grandmother saying she needed to identify a dead body at the coroner's office. When confronted by the social worker, mother claimed the gardener had used her cell phone to send the text message, which was intended for someone else.

Mother was seeing a therapist, Beatriz Granja, who reported mother tends to be impulsive and becomes angry and verbally inappropriate. Granja said that mother had poor insight, her progress had been slow, and she was very volatile. She thought psychotropic medication would be helpful to mother, but mother, who had taken psychotropic medication in the past, was not open to taking it again. Granja also reported that mother had missed some appointments.

Mother had spoken with her parent advocate, Lisa Workman, who suggested a medication evaluation and provided her with a telephone number for Orange County Mental Health. However, mother expressed concern about taking psychotropic medication again. The social worker encouraged mother to proceed with the medication evaluation. Mother later reported that she had made an appointment with Orange County Mental Health, but that she had not followed through. She said she would rather just see her own doctor. When the social worker asked mother if she would take psychotropic medication if it were recommended by her doctor, she said she did not want to.

Mother was referred to random drug testing. As of the date of the six-month status review report, mother had missed 16 tests. Mother was very agitated and angry when questioned about the missed drug tests and insisted she ought not to have to do drug testing. At one point, mother admitted that she did not even call to see when she had to test.

The social worker reported that mother's compliance with her case plan had been moderate. She had completed a parenting course and had taken a few personal empowerment classes. However, she had not completed a domestic violence prevention plan at that point. The social worker recommended that services be continued, the children not be returned to mother at that time, and the matter be continued to the 12-month permanency review hearing.

The court found that mother's progress had been moderate and it accepted the recommendation of the social worker. It also ordered a "730 evaluation" for mother, to be performed by Dr. Christian Godwin, and set the case for a progress review hearing.[1]

---

[1]  Evidence Code section 730 permits the court to appoint an expert "to investigate, to render a report as may be ordered by the court, and to testify as an expert at the trial of the action relative to the fact or matter as to which the expert evidence is or may be required."

*(4) Evidence Code Section 730 Evaluation—*

Godwin prepared a forensic psychological evaluation (section 730 evaluation) dated May 30, 2014. He recommended that psychotherapy sessions with Granja continue, for the treatment of mother's "personality disorder, specific to antisocial and borderline personality disorder traits." Godwin continued on to state that while mother had "refused a referral to a psychiatrist, it [was] recommended that she accept this referral in an effort to consider all possible treatment options."

*(5) Mother's Bad Behavior—*

About six weeks later, the Orange County Social Services Agency (SSA) filed an ex parte application concerning an out-of-county move for C.O. C.O.'s caregiver/maternal aunt was moving in with her boyfriend and his four sons in Riverside. C.O. was very excited because he liked the boyfriend and his sons and was always invited along to outings, such as football games. Mother, however, opposed the move, even though she was promised visitation with C.O. would continue. The court approved the out-of-county move over mother's objection.

Five days later, L.P.'s caregiver/maternal aunt reported that the windows on two of the family's vehicles had been smashed. The maternal aunt heard the sound and looked out the window. She saw mother driving away from the scene. She reported the incident to the police. The maternal aunt expressed concern for the safety of herself and her family, including L.P. The next day, the maternal aunt obtained a restraining order against mother on behalf of her entire household, including L.P.

In mid-August 2014, while C.O.'s caregiver/maternal aunt was monitoring a call between mother and C.O., mother told the child she was going to pick him up, "steal him, and take him to Mexico with her." The aunt told C.O. to end the call. Mother texted the aunt and said "that she was sending the police to her home." Two days later, when mother was visiting with C.O., she asked him what their address was and asked him the name of the aunt's boyfriend so she could "look him up."

7

The visitation monitor reported that mother was behaving oddly during the visit and made inappropriate gestures and comments towards her. She watched mother leave and saw her stop and talk to a man nearby, then speed away in her car. The monitor went and talked to the man. He said mother had thrown him a set of keys and told him, "'These are the keys to the building. If you want, go steal from it.'" The monitor recognized the keys as being the keys to the visitation facility. Mother later admitted having given the keys to the man.

SSA filed another ex parte application, seeking a stay away order to keep mother from C.O. It also informed the court that it was removing C.O. to a foster home, out of fear that mother would attempt to locate C.O. and abduct him. The court issued a temporary restraining order against mother.

*(6) 12-Month Review—*

In its September 4, 2014 status review report for the 12-month permanency planning review hearing, SSA reported that C.O. did not want to return to mother. He said if he went back, she would "do drugs, mess with people, fight with people. Do all kinds of bad things." C.O. had been placed in a foster home and he reported being happy there and enjoying playing with the foster parents' younger relatives. When asked how he liked his foster home, on a scale of one to 10, C.O. said, "100, no 1000." He added "that he really liked his foster parents."

L.P. wanted to continue living with his caregiver/maternal aunt, even past attaining age 18, although he was willing to pursue the Transitional Housing Placement Program. He did not want to be adopted.

Regarding services provided, the report noted, inter alia, that mother had received visitation with C.O., had received transportation passes, had been provided with a picture of L.P., had been referred to parent mentor services, had participated in and completed a 10-week personal empowerment program, had completed parenting and

8

domestic violence programs, had received a section 730 evaluation, and had participated in therapy with more than one therapist.

However, the report also provided details about a pattern of missed appointments and unproductive appointments, and about mother's desire to terminate therapy. In her termination report dated June 30, 2014, Granja reported mother continued to struggle to accept responsibility for child neglect, exhibited poor insight into the impact of past neglect on her children, and claimed that she was the victim. She continued to struggle with poor impulse control and with the ability to communicate in a neutral way when angry, and lacked much insight into her own anger issues and how they impact others. Granja summarized by saying, "Prognosis is poor . . . ."

Another therapist, La Tonda Hardy-Davis, started seeing mother on July 28, 2014. Although they initially seemed to have a good rapport, by mid-August 2014, Hardy-Davis reported that mother had failed to show for her last two sessions. In early September, Hardy-Davis discontinued therapy services due to mother's third no-show.

The status review report reiterated mother had been required to submit to random drug testing, but had missed many tests. It also showed that mother had been angry and threatening with test staff, but had nonetheless taken a number of tests with negative results.

The report stated both children were unadoptable. The social worker opined that mother had not mitigated the issues that had brought the children into dependency and that the children remained at risk of further neglect if returned to her care. She stated: "Based on the mother's denial of domestic violence, apparent support of her abuser, and [her] minimization and lack of insight as to how . . . these factors resulted in neglect and continue to pose a risk to her children, the undersigned believes that the mother is significantly lacking in protective capabilities." In conclusion, the social worker recommended terminating reunification services and establishing a permanent plan of long-term foster care.

9

The court adopted the recommendations of the social worker, and ordered that mother's reunification services be terminated and C.O. remain in long-term foster care. It further ordered a transition from a foster setting to independent living as the permanent plan for L.P. The court ordered continued visitation of three hours once a week for mother. It also continued the restraining order to keep mother away from C.O. except for scheduled visitation.

*B. Analysis:*

At the 12-month review hearing the court found, pursuant to Welfare and Institutions Code section 366.21, subdivision (f), that the return of the children to mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being and that reasonable services had been provided to mother. Mother claims the reunification services provided to her and the family were not reasonable because she did not receive mental health services. She emphasizes that the result is C.O., who was found to be unadoptable, was placed in long-term foster care when she was the only person committed to him. She also contends the court erred in its application of Welfare and Institutions Code section 366.21, subdivision (g).

Welfare and Institutions Code section 366.21, subdivision (g) provides in pertinent part that when "a child is not returned to the custody of a parent . . . at the permanency hearing held pursuant to subdivision (f), the court shall do one of the following: [¶] (1) Continue the case for up to six months for a permanency review hearing . . . . The court shall continue the case *only if* it finds that there is a substantial probability that the child will be returned to the physical custody of his or her parent . . . and safely maintained in the home within the extended period of time *or* that reasonable services have not been provided to the parent . . . ." (Italics added.)

10

Mother concedes that, as a technical point, the court articulated a finding that reasonable services had been provided to her. However, she claims the reporter's transcript belies the purported finding. She says that, in reality, the court found only that it would not have made any difference whether reasonable services were provided or not.

Mother points to an exchange on the reporter's transcript at the 12-month review hearing. Mother's attorney stated he was new to the case, having been appointed only three weeks earlier. However, based on mother's testimony that day, he thought it was "glaringly obvious" that a section 730 evaluation was needed. On the apparent assumption that no section 730 evaluation had been performed, the new attorney opined that reasonable services had not been provided.

In ruling, the court stated the "sad reality [was] there [was] not a substantial probability that anything [would] realistically be different six months from [then] if the court were to extend services . . . ." It further stated, with respect to the question of reasonable services, "the reality is services don't have to be perfect . . . ." It continued: "And it does seem that reasonable services were offered. Maybe in hindsight things could have been a little bit different. I wonder why a 730 wasn't provided to her. But, given her participation in the services that were provided to her, her lack of commitment to faithfully attend all of the therapy sessions, the missed tests, are a major problem for the court. . . . So I'm not necessarily convinced that, had the services been provided to her, that she would have availed herself of them, anyway."

Mother says the court's comments show it applied the wrong standard because instead it found it would not have mattered even if reasonable services, meaning a section 730 evaluation and psychiatric services, had been provided. We disagree with mother's characterization for two reasons.

First, the court specifically found reasonable services had been provided. This being the case, the court did apply the correct standard. It simply commented in addition, and correctly so, that the services were not required to be perfect. "In almost all

11

cases it will be true that more services could have been provided more frequently and that the services provided were imperfect.  The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Second, despite the erroneous comments of mother's new attorney to the effect that no section 730 evaluation had been provided, the record clearly reflects that a section 730 evaluation was prepared by Godwin.  He recommended that the psychotherapy sessions with Granja continue and that mother be referred to a psychiatrist.  However, mother refused to accept a referral to a psychiatrist.

The long and the short of it is that mother received therapy services from two different providers, Granja and Hardy-Davis, but she was inconsistent in her attendance and rejected the advice to go on psychotropic medication.  She was referred for a medication evaluation at Orange County Mental Health, but refused to go.  She received a section 730 evaluation, but refused the recommended psychiatric treatment.  Mother was indeed provided with the services she purported not to receive.

"'[W]henever a minor is removed from a parent's . . . custody, the juvenile court shall order the probation officer to provide child welfare services . . . to the . . . parents . . . for the purpose of facilitating reunification of the family . . . .'  [Citation.] Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual.  [Citations.]  [¶] In reviewing the reasonableness of the services provided, this court must view the evidence in a light most favorable to the respondent.  We must indulge in all legitimate and reasonable inferences to uphold the verdict.  If there is substantial evidence supporting the judgment, our duty ends and the judgment must not be disturbed.  [Citations.]"  (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 545.)  Substantial evidence supports the court's order in this matter.

12

## III

## DISPOSITION

The order is affirmed.

MOORE, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.