Filed 10/25/19 Certified for Partial Pub. 11/21/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | C088052 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>A.R.,<br><br>        Defendant and Appellant. | (Super. Ct. No. JD237783) |

Mother of the minor, J.R., appeals from the juvenile court's September 11, 2018, order selecting guardianship as the permanent plan and terminating dependency jurisdiction. She also appeals from the court's January 13, 2017, visitation order. (Welf. & Inst. Code, §§ 366.26, 395 (unless otherwise stated, statutory section references that follow are found in the Welfare and Institutions Code).) Mother claims the court erred in

dismissing dependency jurisdiction because it could no longer ensure that the guardians would follow through with the visitation schedule. She further claims the court erred by failing to ensure the parties abided by its January 13, 2017, visitation order.

The Sacramento County Department of Child, Family and Adult Services (Department) argues mother forfeited her claim regarding the January 13, 2017, visitation order for failure to timely appeal the order or file an extraordinary writ petition and, in any event, mother's claims fail on the merits.

We affirm the juvenile court's orders.

## FACTS AND PROCEEDINGS

The minor first came to the attention of the Department on December 5, 2016, when it was reported that mother had relapsed into the use of alcohol and was driving under the influence of alcohol with the 12-year-old minor in the car. The maternal grandmother and maternal step-grandfather (the maternal grandparents) reported the minor had been living with them for the previous two weeks, at mother's request, due to mother's relapse.

<u>Interview</u> <u>with</u> <u>the</u> <u>Minor</u>

The Department interviewed the minor, who stated his mother was an alcoholic and he knew when mother was drinking because her eyes were bloodshot and "she gets livid, angry very fast and over acts about things." The minor said mother had driven drunk while he was in the car and, when he told her she "shouldn't be doing this," she told him to get in the car anyway. The minor stated he stayed in his bedroom most of the time to "stay clear of" mother, adding that he felt "upset" and wanted to go live with his grandparents when mother was drinking. The minor reported, "My environment is not stable; I go to bed after 11:00 p.m. during the school nights because my mom's television is blasting and my mom has not set [a] schedule for me." He reported that, several weeks prior, he asked his maternal grandparents if he could live with them because mother had

2

been drinking again, noting, "I don't feel safe living with my mom because she drinks off and on, which keeps me up at night time because I don't know what is going to happen when I go to sleep." He also stated that mother needed to stop drinking alcohol and be sober for several months in order for him to feel safe at home again.

The Dependency Petition

On December 20, 2016, the Department filed a dependency petition pursuant to section 300, subdivision (b), alleging mother's failure to protect the minor due to her ongoing and untreated substance abuse problem. The petition alleged mother consumed alcohol to the point of intoxication on a regular basis while caring for the minor, had relapsed on alcohol, and had driven under the influence of alcohol with the minor present in the car. The juvenile court ordered the minor detained and placed with the maternal grandparents on December 23, 2016. When told he was being placed with the maternal grandparents, the minor flashed a big smile and clapped his hands.

January 13, 2017, Jurisdiction/Disposition Hearing

The juvenile court sustained the allegations in the dependency petition, adjudged the minor a dependent, and removed him from mother's care. The court ordered reunification services for mother and further ordered mother to participate in dependency drug court.

The court found the minor's adjudicated father, M.S., who admittedly he had only seen the minor twice since birth and had no relationship with either the minor or mother, would not benefit from reunification services. M.S. is not a party to this appeal.

July 21, 2017, Pre-Permanency Review Report

According to the July 2017 pre-permanency review report, mother's participation in reunification services was minimal at best. Mother reportedly completed her initial counseling session but thereafter failed to participate. Neither mother nor the minor

participated in conjoint therapy reportedly due to the minor's "continued refusal to participate in therapy and have contact with the mother." While mother eventually completed short-term counseling, the therapist reported that it was unclear whether mother benefited. Mother refused to participate in parenting classes, stating she had already " 'done so many parenting classes in the past and that stuff they are teaching is stupid' and it doesn't have anything to do with her 'son's heart' and her 'sobriety' which is all she cares about." Mother failed to sign a consent to release her medical records to the Department, or to provide the names and contact information for her medical providers.

Mother was reportedly noncompliant with her substance abuse services. She was discharged from Strategies for Change due to excessive absences. She was transferred to Well Space residential treatment program due to her requirement of a higher level of treatment, but was discharged from that program as well after demonstrating behavioral problems, disrupting group sessions, failure to test, leaving the facility without authorization, and failing to provide verification of her attendance. As of June 9, 2017, mother had not returned to treatment or made contact with her recovery specialist. Mother was only minimally compliant in dependency drug court and she struggled with her sobriety, failing to test on several occasions, testing positive for alcohol and admitting alcohol use numerous times, and testing positive for methamphetamine and benzodiazepines on at least two occasions.

According to the report, the minor felt safe living with the maternal grandparents and wished to continue living with them despite mother's desire for him to be returned to her custody. The minor stated he was "finally living comfortably and not having to deal with his 'mother's drunken behaviors.' " He also noted that "things are so much better" living with his maternal grandparents. The maternal grandparents were approved as caregivers on June 12, 2017, and confirmed their ability and willingness to adopt the minor.

4

The visitation schedule called for twice weekly observed visits. Mother and the minor visited three times in January 2017. Subsequent visits were changed to supervised status due to mother's agitation and argumentative behavior toward the visitation supervisor and her attempts to separate herself and the minor from the visitation supervisor during visits. During the next two supervised visits in January 2017, mother continued to be argumentative and act aggressively toward the visitation supervisor. Mother cancelled a visit in February 2017 because she was going out of town, and requested that the next visit be changed due to a treatment schedule conflict. The minor cancelled a February 10, 2017, visit because he wanted to attend a school dance.

In February 2017, mother expressed concern over the minor's refusal to visit with her. The social worker explained that the minor wanted to discontinue seeing mother because "the person he saw during the visits 'was not his mother,' " and he was "embarrassed" by mother's behavior toward others and felt sorry for those having to deal with that behavior. Mother acknowledged she had been rude to the visitation supervisor and stated the minor did not deserve to witness her negative behavior.

On February 15, 2017, the maternal step-grandfather informed the social worker that the minor was unhappy about the visitation schedule, did not wish to attend the day's visitation, and wanted to decrease visits to once a month. The maternal step-grandfather explained that the minor's only explanation for the requested change was that mother had " 'changed, and she's not my mom.' " When the step-grandfather reiterated to the minor that visits were mandatory and court-ordered, the minor responded, " '[F]ine, I will see her for 1 hour a month.' " The minor also reportedly stopped answering mother's telephone calls and text messages, and refused calls made by mother to the step-grandfather. A referral was made for individual counseling for the minor to address his concerns about visitation, and the step-grandfather was instructed to continue to encourage the minor to participate in weekly visitation. The social worker also spoke directly with the minor, who stated he did not want to be around mother because of her

5

" 'bad attitude and the way she treats people' because it [made the minor] 'feel bad.' " The minor reiterated that he would not attend the day's scheduled visitation.

Mother admitted using alcohol on February 21, 22, and 23, 2017, after which the minor refused visitation. On March 3, 2017, the minor told the social worker that he did not wish to visit with mother and would only consider seeing her one time per month "if forced." Mother relapsed again on March 8, 2017, and the scheduled visits were temporarily placed on hold pending assessment. She again admitted using alcohol on March 14, 2017, and March 20, 2017, and tested positive for alcohol, methamphetamine, and benzodiazepines on March 15, 2017, causing the minor to decline visitation in each instance.

On March 21, 2017, mother sent an e-mail to the social worker stating, " 'In reference to the visitation, I still have not received any copies of any reports to know what I need to do differently. Also, the longer it takes between visits the longer it takes for me to reunite with my son. I would like to know how the county plans to address that. As I said before I have never been through this process and I do not know how things work. So I am asking you. Thank you.' "

Mother and the minor visited on March 22, 2017. Several days later, the social worker sent mother the following e-mail in response to mother's March 21, 2017, e-mail stating, in part: " 'I have spoken with you on several occasions about your visits, in addition to our more extensive conversation with my program manager on February 10, 2017. I am not certain why you stated you continue to wait to hear from me regarding this. Circumstances have changed such that your son began refusing visits as we also discussed. I informed you that the Department would still check in weekly to encourage your son to participate in visitation. I also feel counseling would be beneficial for your son; however he is refusing counseling at this point as well.' "

On March 28, 2017, the minor explained to the social worker that he did not want to see mother weekly and would like to resume monthly visits instead, stating he did not

6

like visiting in a visitation area or with a visitation supervisor, he was not comfortable seeing his mother frequently because it took him away from other activities he would rather be doing, such as being with his friends or participating in martial arts. The social worker encouraged the minor to express his concerns with a counselor; however, the minor stated he was not comfortable talking to anyone about the matter and he felt he was handling it well himself. The social worker informed the minor that counseling would always be available for him and the issue of visitation and therapy would be addressed each time he and the social worker met.

Mother admitted using alcohol again on March 31, 2017, and April 3, 2017, causing the minor to decline visitation in each instance. On April 18, 2017, the minor repeated his position that he only wanted to visit mother once per month. The minor visited mother for two hours on April 28, 2017, and reportedly had " 'a really good time.' " After the visit, the minor stated he wanted to visit with mother every two weeks.

The minor's next visit with mother occurred on May 24, 2017, at Well Space. Two days later, mother contacted the family service worker and requested, without explanation, that the visit location be changed from Well Space to a county office location. The social worker subsequently learned that mother had left treatment without authorization and had been discharged from Well Space. As a result, the visitation scheduled for June 2, 2017, was put on hold temporarily for mother to make herself available for assessment.

On June 5, 2017, the minor informed the family service worker he "would not be visiting with the mother 'for a while,' " until mother demonstrated she had been sober for " 'a while.' " On June 9, 2017, mother spoke with Supervisor Chaudhary and accused the Department of allowing the minor to refuse visits and claimed he was being "brain washed" by the maternal grandparents. Chaudhary noted mother repeated herself numerous times during the 45-minute telephone conversation and mother's speech was difficult to understand, random, and off-topic.

7

As of the July 21, 2017 report, there were no further visits between mother and the minor due to mother's "ongoing confirmed and suspected substance abuse" and failure to make herself available to be assessed by the Department. It was also noted that, despite the minor's continued refusal to participate in visitation with mother, the Department continued to encourage and facilitate weekly visitation as scheduled.

On August 15, 2017, the court dismissed mother from dependency drug court for failure to participate.

On August 18, 2017, the court ordered mother back into dependency drug court and continued her reunification services. The court issued the following visitation order: "The parents [A.R. and M.S.] shall have regular visitation with the [minor] consistent with the [minor's] well-being. The [Department] shall determine the time, place and manner of visitation, including the frequency of visits, length of visits, and whether the visits are supervised and who supervises them. The Department's discretion shall extend to determining if and when to begin unsupervised overnight and weekend visits. The parents shall not be under the influence of alcohol or controlled substances during visits and if found to be so, that visit shall be terminated. The Department may consider the [minor's] desires in its administration of the visits, but the [minor] shall not be given the option to consent to, or refuse, future visits."

The court subsequently dismissed mother from drug dependency court after failing to attend three compliance hearings.

December 29, 2017, Permanency Review Report

As of December 2017, mother was minimally compliant with some services and noncompliant with others she felt were unnecessary (e.g., parenting classes) or from which she had been terminated due to failure to attend or noncompliance (e.g. substance abuse programs). Mother requested that conjoint therapy with the minor be enforced. Supervisor Chaudhary explained that the Department coordinated, arranged, and

encouraged conjoint therapy but could not force the minor to attend. Mother noted her last visit with the minor was on May 24, 2017, and complained that visitation was not occurring because the minor was "being brainwashed by the maternal grandparents."

The minor remained in the home of the maternal grandparents, where he felt "stable" and wanted to remain. He repeatedly declined to participate in counseling services despite continued encouragement and support from Department staff and the maternal grandparents.

The report noted the court-ordered twice-weekly visitation schedule had not been followed due to "mother's failure to progress in her treatment, and the [minor's] continued refusal to have visitation with the mother." Despite encouragement from the Department and the maternal grandparents, the minor reportedly maintained his position that he did not want to have contact with mother unless she was free of substances and healthy, and was determined to keep himself safe and "protect himself from past trauma related to the mother." The Department reported that because mother had refused face to face visits with Department staff since September 6, 2017, despite numerous efforts by staff to do so, had not made progress in her case plan services (in particular, her substance abuse treatment services), and had failed to be reassessed for treatment, her use of substances was unknown and she therefore posed a "high risk" of abuse or neglect to the minor.

February 5, 2018, Contested Permanency Hearing (§ 366.21(f))

At the February 5, 2018, contested permanency hearing, the court noted mother made minimal progress toward alleviating or mitigating the causes necessitating removal of the minor and terminated her reunification services. The court continued the minor as a dependent, set the matter for a section 366.26 hearing, and ordered visitation for mother subject to the terms previously stated in its August 18, 2017 order.

9

June 1, 2018, Selection and Implementation Report

The minor, who had been placed with the maternal grandparents since December 20, 2016, expressed to the social worker that he was happy and wanted to be adopted by his maternal grandparents. He reportedly attended weekly Al-Anon meetings which he enjoyed. The Department concluded mother's ongoing untreated substance abuse issues placed the minor at substantial risk of physical harm, abuse, and neglect.

June 1, 2018, Selection and Implementation Hearing (§ 366.26)

At the June 1, 2018, selection and implementation hearing, minor's counsel informed the court that the minor was unsure whether he preferred guardianship or adoption as the permanent plan, and that the maternal grandparents would possibly be moving to South Carolina for the maternal grandmother's job with the airlines. The court continued the hearing to June 22, 2018, to allow the Department to conduct a team decision meeting (TDM) with all parties to discuss the issues presented. The court also ordered mother to be present at the section 366.26 hearing.

June 22, 2018, Report Addendum

The report addendum stated the Department conducted the TDM meeting on June 11, 2018. The parties discussed placement of the minor in the event the maternal grandparents moved to South Carolina. It was determined that the minor would remain with the maternal grandparents. The minor expressed that he had changed his mind regarding permanency and wanted a plan of guardianship and did not want mother's parental rights terminated. The minor stated he wanted to continue to live with the maternal grandparents but also wanted the freedom to visit his family. The maternal grandparents stated they would never prevent the minor from visiting his family but wanted to ensure all visits took place in a safe location. The parties agreed all visits with the siblings would take place at the home of the minor's grandfather, B. The minor also stated, during the TDM meeting, that he was not comfortable with a formal visitation

10

order and felt sure his maternal grandparents would allow him to visit his family members.

On June 13, 2018, the social worker contacted the minor, who stated that, after talking with his maternal grandparents, he wanted a permanent plan of adoption by his maternal grandparents. The minor stated he was happy living with the grandparents and trusted them to allow him to have contact with his mother and other family members. The social worker informed that minor that, if he were adopted, the maternal grandparents could deny contact between the minor and his family members, including mother. The minor stated he understood and he trusted the maternal grandparents would not deny him contact with his family. The minor also stated he was comfortable moving to South Carolina with his maternal grandparents once the adoption was finalized.

On June 22, 2018, at mother's request, the court continued the section 366.26 hearing to July 20, 2018.

### July 20, 2018, Report Addendum

In a July 20, 2018, the Department updated the court and the parties on the minor's desires regarding a permanent plan. The minor reportedly did not want to see mother's parental rights terminated, stating he held out hope that mother would "get clean" so he could maintain a relationship with her. The minor's goal was to move to South Carolina with his maternal grandparents under a plan of guardianship, but he felt conflicted about how the plan would affect his relationship with his siblings. The Department acknowledged a plan of guardianship would require a strategy to facilitate visits between the minor, who would be living in South Carolina, and his mother and siblings, who would be living in California, and noted the maternal grandmother worked for an airline so the minor could fly for free. The minor wanted visits with his siblings, mother, and grandfather every three months, and the maternal grandparents confirmed

11

they would never attempt to prevent the minor from having those visits. The Department recommended that the court order mediation to help craft an appropriate visitation plan.

August 27, 2018, Settlement Conference

Mother did not attend the August 27, 2018, settlement conference. Minor's counsel informed the court that the maternal grandparents had sold their home and would be moving out of the state on September 16, 2018.

September 11, 2018 Contested Selection and Implementation Hearing

Mother was present at the September 11, 2018, contested selection and implementation hearing. The minor confirmed his preference for a plan of legal guardianship to provide him permanency and flexibility. Mother opposed a plan of guardianship with the maternal grandparents and requested the court order that the minor not be allowed to move out of state and that the dependency remain open to allow the court to "make sure that the grandparents follow through with the visitation schedule." Mother expressed her concerns regarding perceived inaccuracies and falsehoods in the reports and complained that there had been "a lot of negative influence and negative speaking" by the maternal grandparents about mother in the minor's presence. Mother's counsel objected to the proposed findings and orders and requested that the court enter a standing visitation order to ensure mother retained the opportunity to visit the minor in South Carolina.

The minor stated, "May I interject and state there wasn't anything bad on behalf of my mom's side. It was not personally to me." His counsel informed the court that the minor preferred to stay in California but felt the maternal grandparents were "the best people for him to live with at this time in his life." Counsel stated she had explained to the minor that the twice-yearly visitation schedule was a minimum which could later be expanded if appropriate, and noted the minor preferred that his visits with mother be unsupervised.

12

The court adopted the recommended findings and orders, modifying the visitation order as follows: "The visitation between [the minor] and his parents to occur a minimum . . . of two times per year. That minimum of two times per year is a minimum for [the minor] to come to California. The parties need to understand as it was explained to me, that [the minor] will be flying standby on those visitations. And so there may have to be an understanding of flexibility about when exactly he leaves and when exactly he returns home to the [maternal] grandparent's home. [¶] As for the visitations for the mother to go visit [the minor] out of state, the Court is imposing a minimum visitation for her to go out there at least two times per year. Again, [the minor's] wishes and his schooling schedule are to be taken into account with that as well. I am going to impose a visitation that is supervised at the discretion of the [maternal] grandparents. That will allow . . . that if down the road the mother's circumstances change and the [maternal] grandparents feel it is appropriate for [the minor] to have visitation with his mother that is unsupervised, they have the discretion to decide that." Pursuant to mother's request, the court ordered the maternal grandparents to facilitate a final visit with the minor, supervised at the discretion of the maternal grandparents, prior to the move to South Carolina. The court terminated dependency jurisdiction.

Mother filed a timely notice of appeal of the court's September 11, 2018, findings and orders.

DISCUSSION

I

*Dismissal of Dependency Jurisdiction*

Mother contends the court abused its discretion when it dismissed dependency jurisdiction over the minor without considering exceptional circumstances that would warrant continuance of jurisdiction. The claim lacks merit.

13

"Following establishment of a legal guardianship, the court may continue jurisdiction over the child as a dependent child of the juvenile court or may terminate its dependency jurisdiction and retain jurisdiction over the child as a ward of the legal guardianship, as authorized by Section 366.4. If, however, a relative of the child is appointed the legal guardian of the child and the child has been placed with the relative for at least six months, the court shall, except if the relative guardian objects, *or upon a finding of exceptional circumstances*, terminate its dependency jurisdiction and retain jurisdiction over the child as a ward of the guardianship, as authorized by Section 366.4." (§ 366.3, subd. (a), italics added.)

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court. [Citation.]" (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.) In making an exit order, the juvenile court must look to the best interests of the child under all the circumstances. (*In re John W.* (1996) 41 Cal.App.4th 961, 973.)

A juvenile court's decision to terminate dependency jurisdiction and to issue exit orders pursuant to section 362.4 is reviewed for abuse of discretion and may not be disturbed unless the court's determination was arbitrary, capricious, or patently absurd. (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.) " ' "When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' [Citations.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.)

Mother's claim of abuse of discretion is not supported by the record. On January 13, 2017, the court ordered the minor detained and placed with the maternal grandparents, where the minor remained for the duration of the dependency proceedings. Mother contends there were exceptional circumstances that required that the court

14

continue dependency jurisdiction, including the minor's previous refusals to visit with mother or to participate in counseling to address the issue of visitation; conflict between mother and the maternal grandparents; and the failure of the Department or the maternal grandparents to take action to facilitate visitation or to get the minor into therapy to facilitate visitation, as well as the absence of information regarding the minor's new home in South Carolina or any consideration as to whether the minor would require services once he relocated.

As set forth in the record, and acknowledged in part by mother in her opening brief, the minor's refusal to visit on numerous occasions was almost entirely due to mother's continuing substance abuse and the fact that the minor did not feel safe being with her when she was not free of substances. Mother was discharged from two drug treatment programs (Strategies for Change and Well Space) and twice dismissed from dependency drug court for reasons including failure to attend, failure to test, behavioral problems, and class disruption, among other things. She struggled with her sobriety, failing to test, testing positive for alcohol, admitting alcohol use, and testing positive for methamphetamine and benzodiazepines on at least two occasions. Each time mother relapsed or admitted using alcohol, the minor refused visitation. For example, during visits in January 2017, mother was agitated and argumentative toward the visitation supervisor and attempted to separate herself and the minor from the visitation supervisor, prompting a change to supervised visits. The minor told the social worker that he wanted to discontinue seeing mother because "the person he saw during the visits 'was not his mother,' " and he was "embarrassed" by mother's behavior toward others and felt sorry for those having to deal with that behavior. The minor expressed the same feelings to the maternal step-grandfather in February 2017, and later explained to the social worker that he did not want to be around mother because of her " 'bad attitude and the way she treats people' because it [made the minor] 'feel bad.' "

15

Mother's untreated substance abuse issues continued throughout the dependency proceedings. Visitation was placed on temporary hold on June 2, 2017, and had not resumed as of December 2017 due to mother's ongoing confirmed and suspected substance abuse, her failure to progress in her case plan services, and her refusal to make herself available for assessment by the Department. Yet, despite having been subjected to mother's substance abuse related behaviors throughout his life and during the dependency proceedings, the minor decided he did not want mother's parental rights terminated and he preferred a plan of guardianship in the hope that mother would "get clean" and, in the meantime, he would have the flexibility to continue to live with the maternal grandparents in South Carolina but also visit his mother, his siblings, and his grandfather in California.

The record also demonstrates that both the Department and the maternal grandparents attempted to facilitate visitation whenever possible and encouraged the minor to participate in counseling. For example, when the minor sought to decrease visits with mother or avoid them altogether, the maternal grandparents reminded him that visits were court-ordered and mandatory. Similarly, the Department instructed the maternal grandparents to encourage the minor to participate in visitation despite the minor's desire not to do so until mother was free from substances. The Department also regularly encouraged the minor to participate in visitation and counseling, coordinated and arranged conjoint therapy for the minor, and informed the minor that counseling would always be available to him and issues related to visitation and therapy would be addressed each time he met with the social worker. As previously discussed, the minor's adversity to visitation was, in nearly every instance, the result of mother's alcohol use (admitted or not), her relapses, and her positive test for illegal drugs, and not the result of any obfuscation or noncompliance by the Department or the maternal grandparents.

Mother contends her claim is supported by *In re Ethan J.* (2015) 236 Cal.App.4th 654 (*Ethan J.*), *In re K.D.* (2004) 124 Cal.App.4th 1013 (*K.D.*), and *In re Joshua S.*

16

(2003) 106 Cal.App.4th 1341 (*Joshua S.*), disapproved on other grounds in *In re Joshua S.* (2007) 41 Cal.4th 261, 273, and is distinguishable from *In re Twighla T.* (1992) 4 Cal.App.4th 799 (*Twighla T.*). We disagree.

In *Ethan J., supra*, 236 Cal.App.4th 654, the juvenile court terminated the mother's services and ordered a plan of guardianship with the maternal grandmother and monthly visits with the mother. (*Id.* at pp. 656-657.) Following the mother's section 388 petition,[1] the court reinstated dependency jurisdiction over the minor and ordered liberal visitation. The parties agreed that the minor would not be forced to visit the mother. (*Id.* at p. 658.) The minor refused to visit the mother. Thereafter, the court ordered therapeutic supervised visitation to be preceded by a therapeutic evaluation of the minor to determine whether visitation would be detrimental to him. However, the minor refused to see the therapist. (*Id.* at p. 659.) Following a contested hearing, the juvenile court terminated its dependency jurisdiction, explaining, " '[I]f I continue dependency . . . it's just going to exacerbate the anger. It's [a] difficult if not impossible situation but there's [nothing] I can do about it.' " (*Ibid.*)

On appeal, the mother claimed the maternal grandmother's unwillingness to promote visitation and the minor's refusal to visit constituted exceptional circumstances requiring the juvenile court's continued oversight to ensure visitation occurred. (*Ethan J., supra*, 236 Cal.App.4th at p. 660.) Noting the maternal grandmother told the juvenile court she would comply with the court's order and had done so in the past, the appellate court concluded it was the minor's refusal to visit that "constituted an exceptional circumstance because it effectively precluded any prospect of visitation" and

---

[1] A parent may petition the juvenile court to modify a prior dependency order pursuant to section 388 on grounds of changed circumstances or new evidence. (§ 388, subd. (a)(1).) The parent must also show the proposed change is in the best interest of the child. (*In re Stephanie M., supra*, 7 Cal.4th at p. 317.)

17

left mother "without any viable legal remedy." (*Ibid.*) The court explained that, "[i]f the juvenile court orders visitation, 'it must also ensure that at least some visitation, at a minimum level determined by the court itself, will in fact occur.' [Citation.] When the court abdicates its discretion and permits a third party, including the dependent child, to determine whether any visitation will occur, the court impermissibly delegates its authority over visitation and abuses its discretion. [Citation.]" (*Id.* at p. 661.) When the minor refused to visit mother or undergo a therapeutic evaluation to determine whether visitation would be detrimental to him, and the juvenile court dismissed its dependency jurisdiction without having made a detriment finding and with the knowledge its visitation order would not be honored, the court "virtually guaranteed that visitation would not occur." (*Ibid.*) The appellate court further concluded that, "in the likely event [the minor] would continue to refuse visitation," the mother had no effective recourse because, although she retained the right to seek modification of the visitation order via a section 388 petition, "she would be hard pressed to show a change in circumstances as long as [the minor] refused to visit her" and "would have great difficulty persuading the court that a modified visitation order was in [the minor's] best interest." (*Ibid.*) Therefore, the appellate court concluded, ongoing dependency jurisdiction was warranted and "the juvenile court by terminating its dependency jurisdiction impermissibly delegated its authority over visitation to [the minor] and abused its discretion. [Citation.]" (*Id.* at pp. 661-662.)

*Ethan J.* is distinguishable. As the Department aptly notes, while the mother in *Ethan J.* made substantial progress in resolving the issues that brought the minor before the juvenile court, here mother's progress toward alleviating or mitigating the causes necessitating removal of the minor was minimal and her services were terminated as a result. More importantly, rather than refusing future contact with the mother like *Ethan J.*, here the minor requested future contact and visitation with mother, hoping mother would get sober so he could maintain a relationship with her. In fact, the minor

18

expressly stated he did not want mother's parental rights terminated and requested visits to California every three months because he wanted to be able to visit mother, as well as his siblings and his grandfather. The minor also requested that visits with his mother be unsupervised, and told the court he wanted to visit with mother prior to moving to South Carolina.

In light of the evidence of the minor's sincere desire to maintain contact with mother and visit her regularly after moving to South Carolina, we reject mother's argument that, like the mother in *Ethan J.*, she too may be hard-pressed to prevail on a section 388 petition to terminate the guardianship in the event the minor refuses visitation because "circumstances may not be found to have changed." As previously discussed, the minor's unwillingness to visit with mother was directly linked to mother's sobriety or lack thereof. The minor's desire now to preserve mother's parental rights and maintain contact and visitation make it more than likely the minor would not refuse visits as long as mother avoided relapse.

As for mother's claim that the court should have retained dependency jurisdiction so that it could "keep an eye on the guardianship" to make sure the maternal grandparents followed through with the court-ordered visitation schedule, there was no evidence that the maternal grandparents had in any way discouraged or prevented the minor from visiting his mother. On the contrary, as discussed above, the maternal grandparents encouraged the minor to participate in visits and reminded him that the visits were court-ordered and mandatory. Further, the maternal grandparents expressly stated they would never prevent the minor from visiting his family and, because the maternal grandmother worked for an airline, transportation could be easily facilitated to and from California.

*K.D., supra*, 124 Cal.App.4th 1013 is similarly distinguishable. There, the juvenile court established dependency jurisdiction over a four-month-old minor with a medical disorder that required treatment and care the mother was unable to provide due to her methamphetamine addiction. (*Id.* at pp. 1015-1016.) A psychologist evaluated the

19

mother and determined that, due to various disorders, methamphetamine dependence, and mild mental retardation, it was doubtful the mother could become stable enough to safely parent the minor. (*Id.* at p. 1016.) The minor was initially placed with the maternal grandmother but, when it was determined she was developmentally delayed and failed to seek medical attention for the minor, he was eventually placed with a foster father, a registered nurse, who provided the minor with regular medical care. (*Ibid.*) The mother had supervised visits but was denied unsupervised overnight visits due to concerns she and the maternal grandmother could not recognize situations that posed a danger to the minor. (*Ibid.*) At the 12-month hearing, it was determined that while the mother progressed well in services, she still lacked the ability to safely care for the minor. The juvenile court terminated services and set the section 366.26 hearing. (*Ibid.*) A bonding study concluded the minor had a stronger bond with the mother than with the foster father and would suffer grief and loss if he were unable to see the mother. The court determined a permanent plan of guardianship with the foster father was appropriate, but subsequently learned the foster father planned to move to another state for work. (*Id.* at pp. 1017-1018.) The foster father stated he intended to permit ongoing contact between the mother and the minor and the social worker recommended contact at least four times a year. (*Id.* at p. 1018.) The court found it would be detrimental to remove the minor from the foster father's care, ordered a minimum of twice-yearly supervised visitation, directed the foster father to bring the minor to California for visits, and terminated dependency jurisdiction. (*Ibid.*)

On appeal, the mother argued the juvenile court should have maintained dependency jurisdiction to oversee visitation. (*K.D., supra*, 124 Cal.App.4th at p. 1018.) The appellate court held that, "[b]y finding the exception to adoption applied and ordering regular visitation, the court had determined that preserving [the minor's] relationship with the mother was in his best interest. It then was obligated to maintain dependency jurisdiction and hold periodic review hearings to monitor whether regular

visitation was occurring." (*Id.* at p. 1019.) Finding that a section 388 petition was inadequate to ensure regular visitation given mother's limitations in the event visitation did not take place, the court concluded it was an abuse of discretion to terminate dependency jurisdiction. (*Id.* at pp. 1019-1020.)

Here, there was no similar bond between the 12-year-old minor and mother which would require special oversight, nor did mother lack the ability to safely care for the minor when she was sober. Given the minor's willingness and desire to maintain visitation and contact with mother, the maternal grandparents' willingness to facilitate such visitation and contact, and the adequacy of a section 388 petition in the event of noncompliance with the court's visitation order, the exceptional circumstances present in *K.D.* are not present here.

*Joshua S., supra*, 106 Cal.App.4th 1341 is inapposite as well. There, the juvenile court terminated dependency jurisdiction over the objection of the minors' counsel after establishing a permanent plan of guardianship by the maternal grandmother, who required financial assistance to care for the minors. (*Id.* at pp. 1353-1355.) The appellate court reversed, concluding the juvenile court abused its discretion when, "Rather than considering the children's best interests," the court focused on "the burden to the court of regular review hearings until the children reached the age of majority, and on the equities of whether Canada or the department should provide the necessary financial assistance." (*Id.* at pp. 1354-1356.)

Here, in contrast, the minor's best interests were of the upmost importance and discussed numerous times throughout the proceedings and during the selection and implementation hearing. The record makes plain that the juvenile court's focus was on carefully considering the minor's position that his maternal grandparents were "the best people for him to live with at this time in his life," along with his wish that he maintain his relationship with his mother and that her parental rights not be terminated, and how

21

best to facilitate visitation between the minor and his mother, his siblings, and his grandfather, pursuant to his wishes.

Contrary to mother's argument, this case is analogous to *Twighla T., supra*, 4 Cal.App.4th 799, where the appellate court affirmed the juvenile court's dismissal of dependency jurisdiction concluding that, like this case, there was substantial evidence demonstrating future visitation was not likely to be a problem "in light of the guardian's cooperative attitude toward visitation" and, if problems were to arise in the future, the mother "would have access to the court through the court's jurisdiction over the guardianship itself" pursuant to section 366.3, subdivision (a) and section 366.4. (*Twighla T.*, at p. 806; see also *In re Heraclio A.* (1996) 42 Cal.App.4th 569, 574-576 [despite terminating dependency jurisdiction, the juvenile court retains jurisdiction over the minor as a ward of the guardianship as a matter of law pursuant to section 366.4 and may hear a petition for modification of the permanent plan].)

Finally, mother claims, in passing, that the juvenile court dismissed dependency jurisdiction without first obtaining any information regarding the minor's new home in South Carolina or considering whether the minor would require services once he relocated. To the extent this observation, made in passing and without a separate heading or citation to authority, is intended to constitute an argument, it must be deemed forfeited. (Cal. Rules of Court, rule 8.204(a)(1)(B) [each point in appellate brief must be supported by citation of authority] further rule references are to the Cal. Rules of Court; *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647 [lack of authority or analysis constitutes forfeiture].) In any event, as the Department points out, the record demonstrates that the maternal grandparents had been approved for adoption as of June 2017 and had been caring for the minor since December 2016. There were no concerns regarding either grandparent, their home, or their care of the minor. As for the minor, he was reportedly well-behaved and respectful, was regularly attending school and meeting all school requirements, and did not present any developmental, emotional, or behavioral challenges

at school or at home. While he was not attending counseling, he was regularly attending Al-Anon meetings which he enjoyed. By all accounts, the maternal grandparents were fully suitable to care for the minor, with whom they maintained a positive relationship.

The juvenile court did not abuse its discretion in terminating dependency jurisdiction.

## II

### *Visitation*

Mother contends the juvenile court erred by failing to ensure the parties abided by the court's January 13, 2017, visitation order. Anticipating an argument by the Department that her claim is forfeited for failure to challenge the visitation order via an extraordinary writ petition from the order setting the section 366.26 hearing, mother acknowledges she did not file a writ petition but argues her claim is not barred because the juvenile court failed to provide her with timely and valid notice of the writ requirement pursuant to section 366.26, subdivision (l) and rule 8.452, et seq.

The Department argues the juvenile court complied with its duty to provide mother with proper and timely writ advisement as required by Rules of Court, rule 5.590, subdivision (b)(2) (hereafter rule 5.590(b)(2)) and, in any event, mother's claim fails on the merits.

As we shall explain, mother's claim is forfeited.

### *Background*

Mother was not present at the February 5, 2018, permanency hearing but was represented by counsel who was present. The court set the section 366.26 hearing for June 1, 2018. At the conclusion of the hearing, the court instructed its clerk to provide mother with notice of the requirement of filing a writ petition. That same day, the court clerk mailed a writ notification to mother at the address she previously provided to the court on June 30, 2017 (i.e., the Klamath River Drive in Rancho Cordova address).

23

Mother was also not present at the March 16, 2018, status hearing but was represented by counsel who was present. The Department advised the court that the Department paralegal had a conversation with mother 30 minutes prior to the hearing, during which mother stated she did not have an address for service of process. The paralegal provided mother with the date of the section 366.26 hearing and the social worker's name and telephone number and instructed mother to call back that day to obtain the date and time for a future status report hearing so that mother could personally appear and be served. The paralegal also requested that mother contact her attorney. The court continued the hearing to March 23, 2018, and ordered the Department to verbally convey that information to mother if possible in order to obtain mother's presence at the subsequent hearing to effect personal service of the notice of the requirement of filing a writ petition.

Mother was absent from the March 23, 2018, status hearing, but was present with her counsel at the September 11, 2018, contested selection and implementation hearing.

*Analysis*

An order denying reunification services and setting the section 366.26 hearing is not an appealable order; it can be reviewed only by a writ petition. (*In re Athena P.* (2002) 103 Cal.App.4th 617, 624-625.) The failure to take a writ from a nonappealable dispositional order forfeits any challenge to that order, except if the juvenile court fails to advise a parent of the writ petition requirement. In that case, the parent generally has good cause to be relieved of the requirement. (*Id.* at p. 625.)

When a juvenile court orders a hearing pursuant to section 366.26, it is obligated to advise the parties of the requirement. (§ 366.26, subd. (*l*)(3)(A); rule 5.590, subd. (b).) If a party is present at the hearing at which the section 366.26 hearing is set, the court must orally advise the party of the writ requirement; if the party is not present, the writ advisement must be mailed by first class mail to that person's last known address.

24

(§ 366.26, subd. (*l*)(3)(A); *In re A.A.* (2016) 243 Cal.App.4th 1220, 1239-1240 (*A.A.*); rule 5.590(b)(2).)

Mother was not present at the February 5, 2018, hearing at which the court terminated her reunification services and set the section 366.26 hearing. Accordingly, as required by rule 5.590(b)(2), the court clerk sent mother the writ advisement via first class mail to the Klamath River Drive address provided by mother to the court in June 2017. Mother claims the court clerk sent the writ notice to an address other than that identified by the Department in its numerous reports as her last known address. She disagrees with the Department's argument that any technical defect in notice does not excuse mother's noncompliance with the writ requirement. Mother's claim lacks merit.

Section 316.1 requires a parent to "designate for the court . . . her permanent mailing address" which is to be used for "notice purposes unless and until the parent or guardian notifies the court or the social services agency of a new mailing address in writing." (§ 316.1, subd. (a).) "A parent's designated permanent mailing address is used by the court and the social services agency for notice purposes *unless and until* the parent provides written notice of a new mailing address." (*In re A.H.* (2013) 218 Cal.App.4th 337, 348 (*A.H.*).)

The record makes plain that the clerk of the juvenile court timely mailed a writ advisement to mother at the last known address provided by mother in her notification of mailing address form (Judicial Council form JV-140) filed at the inception of the dependency proceedings. Interestingly, mother does not claim she did not receive the writ notification, nor does she confirm an appropriate address for service of the notice. She simply argues the court clerk sent the writ advisement to the Rancho Cordova address, which was not the Citrus Heights address identified as mother's address in several of the Department's reports. As discussed more fully below, the fact that the Department sent mailings to the Citrus Heights address on several occasions is without consequence given that mother never filed a written change of address notifying the court

25

that her Klamath River Drive address changed. When the juvenile court strictly complies with section 316.1, subdivision (a), but the parent fails to inform the court of her new mailing address, the parent's failure to receive advisement of her writ rights properly and timely mailed "does not constitute good cause to excuse the parent's failure to file a petition for extraordinary writ." (*A.A., supra,* 243 Cal.App.4th at p. 1242; *A.H., supra,* 218 Cal.App.4th at pp. 348-351.)

Mother argues the facts are similar to those in *A.A., supra,* 243 Cal.App.4th 1220, and urges us to reach the same result as the appellate court did there. We decline to do so because, as we shall explain, *A.A.* is distinguishable.

In *A.A.*, the mother was not present at the November 12, 2014, hearing when the juvenile court terminated her reunification services and set the permanency hearing. The court directed the clerk to send the writ advisement to the parents by first class mail " 'to the last known address.' " (*A.A. supra,* 243 Cal.App.4th at pp. 1240-1241.) Five days after the hearing, the clerk mailed the writ advisement form to the mother at an address on 6th Street in San Bernardino, an address gleaned from a social worker's report. Three months later, the forms were returned to the court marked " 'RETURN TO SENDER' " with a handwritten notation on the envelope stating, " 'Not live here.' " (*Id.* at pp. 1241-1242.) The mother contended the writ advisement notice did not comply with rule 5.590(b)(2). (*Ibid.*)

The court of appeal agreed that, among other things, the juvenile court clerk "did not mail the notice to an address where mother would likely receive it." (*A.A., supra*, 243 Cal.App.4th at p. 1242.) In that regard, the appellate court noted (1) the 6th Street address first appeared in the record in an April 15, 2014, jurisdictional/dispositional report, but the juvenile court was aware, as early as March 25, 2014, that the mother had no address where she could be reached, (2) the social worker had been informed by the current residents of the 6th Street location that those residents, who were unrelated to either of the parents, had lived at that location for three years, and (3) the social worker

26

reported in a November 12, 2014, report that the mother's address was unknown and the mother had reported she was homeless. (*Ibid.*) The appellate court found the court clerk mailed the writ advisement to the 6th Street address despite that the juvenile court knew, for at least seven months, that neither of the parents lived at that address. The court further found that the mother's homelessness at the time of the setting hearing did not excuse the juvenile court in mailing the writ advisement "to an address it knew was no longer good." (*Id.* at pp. 1242-1243.)

*A.A.* is distinguishable. There, the mother never filed a notification of mailing address. The court clerk gleaned the mother's mailing address from a social worker's report despite that the court was aware the mother had no address. (*A.A., supra,* 243 Cal. App. 4th at pp. 1242-1243.) Here, in contrast, mother filed an initial notification of mailing address (Judicial Council form JV-140) on December 23, 2016, identifying the Citrus Heights address as her mailing address. The form JV-140 expressly stated that mother was required to provide her permanent mailing address to the court, and that all notices and documents would be sent to the address provided unless and until mother notified the court or the social worker, in writing, of a new mailing address. Thereafter, and until mother filed a new notification of mailing address on June 30, 2017, all mailings from the court were sent to the Citrus Heights address identified in mother's JV-140 form. Mother filed her change of address on June 30, 2017. From that point on, including the mailing of the writ advisement after the February 5, 2018 hearing, the court sent notices to the new Rancho Cordova address provided by mother in her updated JV-140 form, despite that the Department continued to identify Citrus Heights as mother's address in its July, August, and December 2017 reports.

Mother argues the Citrus Heights designation in the Department's reports demonstrated that the court "was informed for approximately seven months, on at least three occasions," that the Citrus Heights address was mother's address, not the Rancho Cordova address. We disagree. The court changed mother's mailing address from the

27

Citrus Heights address to the Rancho Cordova address pursuant to mother's updated JV-140 form. The Department's failure to modify mother's address to comport with the updated JV-140 form did not override mother's filing of the form, nor did it serve to revert her address back to the previous Citrus Heights location or give the court reason to know mother had an address different from the Rancho Cordova address.

Mother asserts that, like *A.A.*, the notice here was not served to an address best calculated to provide her actual notice. On the contrary, unlike *A.A.*, where the mother never provided an address to the court, here the Rancho Cordova address was the best and most recent address the court had *from mother herself*, an address which had not been changed *by mother*.

Finally, mother claims it cannot be presumed that the notice sent by the court clerk was actually received by mother at the Rancho Cordova address, arguing the process server who went to the Rancho Cordova address was informed by the then-current tenant that "mother is not known." The claim lacks merit, as the process server did not attempt service at the Rancho Cordova address until March 15, 2018, well over a month after the clerk mailed the writ advisement to that address.

Mother was properly and timely served with notice of the writ requirement. Her failure to take a writ from the February 5, 2018, order terminating her reunification services and setting the section 366.26 hearing forfeits her challenge to that order.

## Disposition

The juvenile court's orders are affirmed.

 _____
 HULL, Acting P. J.

We concur:

_____
MURRAY, J.

_____
RENNER, J.

Filed 11/21/19

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | C088052 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, | (Super. Ct. No. JD237783) |
| Plaintiff and Respondent, | ORDER OF PUBLICATION |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Shama Hakim Mesiwala, Judge. Affirmed.

Seth F. Gorman, under appointment by the Court of Appeal, for Defendant and Appellant.

Lisa A. Travis, County Counsel, Traci F. Lee, Interim County Counsel, Nicole L. Roman and Elizabeth H. Wright, Deputy County Counsel, for Plaintiff and Respondent.

_____

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I.

1

THE COURT:

The opinion in the above-entitled matter filed October 25, 2019, was not certified for publication in the Official Reports.

For good cause it now appears that the opinion should be published in the Official Reports and it is so ordered.

_____

HULL, Acting P. J.

_____

MURRAY, J.

_____

RENNER, J.

2